**In re Oscar L. JONES and Martha Jones, Debtors.**

**Bankruptcy No. 91–20593.**

United States Bankruptcy Court, E.D. Michigan, S.D. Flint.

Feb. 23, 1993.

UAW–GM Legal Services Plan by Rae Anne Anderson, Marlene Dayne, Asst. U.S. Atty.

Carl L. Bekofske, Chapter 13 Trustee.

Christine S. Rueff, Kevin D. Welsh, for NBD Bank.

Linda Johnson, for Dept. of HUD.

Charles J. Hiemstra, for Geraldine Foley.

## MEMORANDUM OPINION REGARDING OBJECTIONS TO PROOFS OF CLAIM FILED BY N.B.D. AND GERALDINE FOLEY

ARTHUR J. SPECTOR, Bankruptcy Judge.

The issues for decision in this case are purely legal: the facts are not disputed. One question is whether a chapter 13 claim secured by a residential mortgage is subject to bifurcation pursuant to § 506(a),[1] with the result that the unsecured portion of the mortgage is avoided pursuant to § 506(d). I hold that such a claim is subject to §§ 506(a) and (d). The other major question is whether, when determining the amount of an allowed secured claim under § 506(a), one must consider the hypothetical costs of selling the collateral. I hold that such costs should not be deducted.

The Debtors filed a petition for relief under chapter 13 of the Bankruptcy Code on May 3, 1991. Geraldine Foley has a claim against the estate of $30,925, which is secured only by a first mortgage on the Debtors' home. NBD–Genesee Bank holds a claim of $9,825, which is secured only by a second mortgage on the Debtors' home. Both mortgages are junior to a lien securing unpaid real property taxes of $3,056.29.

The Debtors utilized the full gamut of procedural mechanisms at their disposal to argue that the claims which NBD and Foley denominated as "secured" in their respective proofs of claim are actually totally unsecured (in the case of NBD) or only partially secured (in the case of Foley). They objected to both proofs of claim, filed a motion to partially avoid Foley's lien, and commenced an adversary proceeding against NBD to obtain a declaration that its lien was void.

The Debtors' objections are premised on two assertions. First, they asserted that the claims of NBD and Foley are secured only in the amount determined by reference to § 506(a), and that their respective liens are void pursuant to § 506(d) to the extent that their claims are deemed unsecured under § 506(a). Second, the Debtors argued that, in making the § 506(a) determination, the Court should deduct $2,000 in estimated sales costs from the home's value of $20,000.[2] Accordingly, the Debtors asserted, Foley holds a secured claim of only $14,943.71 ($18,000.00 less $3,056.29) and an unsecured claim of $15,981.29 (the remainder of the full $30,925 claim), while NBD has no secured claim at all, but merely an unsecured claim for $9,825.00. The Debtors further asserted that the liens of NBD and Foley must be declared void, in whole or in part, pursuant to § 506(d).

Foley and NBD argued in response that bifurcation of their claims under § 506(a) would be contrary to § 1322(b)(2), and that § 506(d) may not be utilized to invalidate underwater liens.[3] Foley also argued that it was inappropriate to charge her for the cost of selling the home, when in fact the home will not be sold but retained by the Debtors.

Before addressing the issues raised in this case, a few points on procedure are in order. As noted by the Debtors, courts have considered the "lien-stripping" effect of § 506 in the context of (1) an adversary

---

1. Except as otherwise noted, all statutory references are to the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

2. The parties stipulated that the home is worth $20,000. Contrary to the Debtors' assertion, however, they did not specify the valuation method by which this figure was derived. *See* p. 2 of Debtors' Brief in Support of Reducing Estimated Cost of Sale From Fair Market Value. Thus it is unclear whether the figure represents the home's fair market value, forced sale value, or some other valuation standard.

3. A lien is "underwater" to the extent that the claim which it secures exceeds the value of the creditor's interest in the estate's interest in the property serving as collateral, as determined under § 506(a). *See, e.g., In re Moses,* 110 B.R. 962, 964 (Bankr.N.D.Okla.1990).

proceeding,[4] (2) a motion to avoid a lien,[5] and (3) an objection to a proof of claim.[6] And since, to my knowledge, the question of whether a chapter 13 debtor can strip a home mortgage has not previously been raised in this judicial district, I cannot fault the Debtors for utilizing not one, but all three procedures. However, I do not believe that these tacks are equally sound from a procedural standpoint.

■ With exceptions not relevant here, the value of collateral securing a claim has no bearing on the allowability of the claim itself. *See* § 502(b) (enumerating the grounds for disallowing a claim). The issue in this case is to what extent (if any) the claims of NBD and Foley are secured, not whether they should be disallowed in whole or in part. *Cf. In re Beard*, 112 B.R. 951, 955 (Bankr.N.D.Ind.1990) ("There are at least three different ways a secured claim may be challenged. The amount of the claim can be questioned, by objecting to its allowance. The value of the lien can be put in issue, by a request to determine secured status. Third, the lien itself can be directly attacked."); *In re Pourtless*, 93 B.R. 23, 25 (Bankr.W.D.N.Y.1988) ("What was involved in this instance ... was not the allowance, validity, or amount of Commonwealth's claim, but a determination of

the value of its security. That determination is governed by section 506 of the Code."). Since the Debtors do not contest the amounts that the creditors claim are owed, there was no need to object to the claims.[7]

■ Nor was it necessary for the Debtors to commence an adversary proceeding to invoke § 506(d). Concededly, some courts have held that avoidance of a lien pursuant to § 506(d) must be litigated in an adversary proceeding, citing F.R.Bankr.P. 7001(2). *In re Franklin*, 126 B.R. 702, 713, 21 B.C.D. 1010 (Bankr.N.D.Miss.1991); *In re Jablonski*, 70 B.R. 381, 385 (Bankr. E.D.Pa.1987), *aff'd in part*, 88 B.R. 652 (E.D.Pa.1988); *In re Morton*, 43 B.R. 215, 221, 12 C.B.C.2d 159 (Bankr.E.D.N.Y.1984). But F.R.Bankr.P. 3012 expressly permits § 506 valuations to be requested by motion, and the advisory committee note relating to that rule distinguishes valuation proceedings from those subject to F.R.Bankr.P. 7001. Therefore debtors need not file a complaint to avoid a creditor's lien under § 506. *See In re Calvert*, 907 F.2d 1069, 1072 (11th Cir.1990); *In re Indvik*, 118 B.R. 993, 1006, 23 C.B.C.2d 948 (Bankr.N.D.Iowa 1990); *Beard*, 112 B.R. at 955; *In re Duncan*, 43 B.R. 833, 835 n. 4,

---

**4.** *See, e.g., Gaglia v. First Fed. Sav. & Loan Ass'n,* 889 F.2d 1304, 1305 (3d Cir.1989), *overruled by Dewsnup v. Timm,* — U.S. —, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992); *In re Lindsey,* 823 F.2d 189, 191 (7th Cir.1987) (where the court noted the lack of any "statutory basis" for the procedure); *In re Cobb,* 122 B.R. 22, 24, 21 B.C.D. 153, 24 C.B.C.2d 1272 (Bankr.E.D.Pa.1990); *In re Bellamy,* 122 B.R. 856, 857, 21 B.C.D. 287 (Bankr.D.Conn.), *aff'd* 132 B.R. 810 (D.Conn. 1991), *aff'd* 962 F.2d 176 (9th Cir.1992); *Goins v. Diamond Mtg. Corp.,* 119 B.R. 156, 157 (Bankr. N.D.Ill.1990); *In re Garnett,* 88 B.R. 123, 124, 17 B.C.D. 1325 (Bankr.W.D.Ky.1988), *aff'd* 99 B.R. 757 (W.D.Ky.1989); *In re Crouch,* 80 B.R. 364, 365 (Bankr.W.D.Va.1987); *In re O'Leary,* 75 B.R. 881, 882, 17 C.B.C.2d 704 (Bankr.D.Or.1987).

**5.** *See, e.g., In re Jablonski,* 88 B.R. 652, 653 (E.D.Pa.1988); *In re Chavez,* 117 B.R. 733, 734 (Bankr.S.D.Fla.1990); *In re Marshall,* 111 B.R. 325, 326 (Bankr.D.Mont.1990); *In re Demoff,* 109 B.R. 902, 903 (Bankr.N.D.Ind.1989); *In re Anderson,* 88 B.R. 877, 878 (Bankr.N.D.Ind. 1988).

**6.** *See, e.g., Jablonski,* 88 B.R. at 653; *Chavez,* 117 B.R. at 734; *Marshall,* 111 B.R. at 325; *In re*

Smith, 92 B.R. 287, 288 (Bankr.S.D.Ohio 1988); *In re Gerhardt,* 88 B.R. 151 (Bankr.S.D.Ohio 1987); *In re Mihalko,* 87 B.R. 357, 18 C.B.C.2d 1387 (Bankr.E.D.Pa.1988).

**7.** In the recent case of *In re Howard,* 972 F.2d 639 (5th Cir.1992), the court "conclud[ed] that a Chapter 13 plan which purports to reduce or eliminate a creditor's secured claim is res judicata as to that creditor only if the debtor has filed an objection to the creditor's claim." *Id.* But the debtor in *Howard* chose none of the three procedural options under consideration here, and the court did not confront the issue concerning which of the three options is most appropriate. The court instead focused on the question of whether the creditor received adequate notice that its lien was in jeopardy. *Id.* at 642. And since sufficiency of notice is not necessarily a concern with respect to any of the three options, *Howard* is weak authority for the proposition that the proper route for a debtor to take when challenging the extent to which a claim is secured is an objection to the claim itself.

12 B.C.D. 685, 11 C.B.C.2d 677 (Bankr.D.Alaska 1984); 9 *Collier on Bankruptcy* ¶ 7001.05[1] (15th ed. 1993).

■ Rather, the appropriate tool for seeking a determination that a lien is (or is not) void pursuant to § 506(d) is a motion to that effect under Rule 3012. *See Calvert*, 907 F.2d at 1072; *In re Linkous*, 141 B.R. 890, 894 (W.D.Va.1992); *Beard*, 112 B.R. at 955; *Collier, supra.* This appears to be the procedure contemplated by the federal rules and, in contrast to claims objections, such a motion does not blur the fundamentally different roles which are generally played by § 502 (governing the allowance of claims) and § 506 (defining the extent to which allowed claims are secured).[8] Having (I hope) clarified that procedural issue, I now turn my attention to the substantive issues.

## I. ARE THE CLAIMS OF NBD AND FOLEY SUBJECT TO BIFURCATION AND LIEN AVOIDANCE PURSUANT TO § 506?

Section 506(a) provides in pertinent part as follows:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim.

■ Thus § 506(a) bifurcates the allowed claim of a creditor holding a lien into an allowed secured claim (determined with reference to the value of the collateral and the extent to which it is encumbered by senior liens, *see infra* p. 183) and an allowed unsecured claim. *See United States v. Ron Pair Enters.*, 489 U.S. 235, 239 n. 3, 109 S.Ct. 1026, 1029 n. 3, 103 L.Ed.2d 290 (1989). With exceptions not relevant here, the creditor's lien is void "[t]o the extent that [such] lien secures a claim against the debtor that is not an allowed secured claim." 11 U.S.C. § 506(d). Since lien avoidance presupposes bifurcation, I must first consider the contention of NBD and Foley that § 1322(b)(2) precludes the Debtors from bifurcating their claims pursuant to § 506(a).

### A. Does modification under § 1322(b)(2) include bifurcation?

■ Section 1322(b)(2) states that a chapter 13 plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims." Thus the statute protects from modification those claims which are secured only by the debtor's home. Courts are divided, however, on the question of whether that protection insulates the residential mortgagee from bifurcation under § 506(a). *Compare In re Bellamy*, 962 F.2d 176, 179–81 (2d Cir.1992); *In re Hart*, 923 F.2d 1410, 1415 (10th Cir.1991); *Wilson v. Commonwealth Mortg. Corp.*, 895 F.2d 123, 127 (3d Cir. 1990); *In re Hougland*, 886 F.2d 1182, 1183 (9th Cir.1989) (protection from modification under § 1322(b)(2) relates only to that portion of a claim deemed secured

---

**8.** There is some disagreement on the question of whether the chapter 13 plan can itself serve as a motion pursuant to F.R.Bankr.P. 3012, or if a separate motion specifically for that purpose must be filed. *Compare, e.g., In re Calvert*, 907 F.2d 1069, 1072 (11th Cir.1990) (separate motion not required, but emphasizing that notice of the confirmation hearing must include "specific notice ... that the bankruptcy court will determine the extent to which the claim is secured"); *In re Pourtless*, 93 B.R. 23, 25 (Bankr. W.D.N.Y.1988) (separate motion not required) *with Howard*, 972 F.2d at 642 (objection to claim required); *In re Doss*, 143 B.R. 952, 954 (Bankr.E.D.Okla.1992) ("A proper request for valuation of property must be done by Motion and cannot simply be requested in a Chapter 13 Plan."). However the issue is raised, it is routinely litigated at confirmation hearings. *See Calvert*, 907 F.2d at 1072; *In re Linkous*, 141 B.R. 890, 894 (W.D.Va.1992); *In re Fox*, 142 B.R. 206, 208 (Bankr.S.D.Ohio 1992) (describing the valuation of collateral at the chapter 13 confirmation hearing as "generally accepted practice in this jurisdiction"); *In re Smith*, 63 B.R. 15 (Bankr.D.N.J.1986). Indeed, one court stated that § 506(a) "requires ... a valuation of the creditor's security 'in conjunction with' a hearing on confirmation of the Chapter 13 plan." *In re Hartford*, 7 B.R. 914, 916, 7 B.C.D. 145, 3 C.B.C.2d 761 (Bankr.D.Me.1981).

pursuant to § 506(a)) *with In re Nobleman,* 968 F.2d 483, 488–89 (5th Cir.), *cert. granted,* —— U.S. ——, 113 S.Ct. 654, 121 L.Ed.2d 580 (1992) (No. 92–641) (bifurcation is prohibited by § 1322(b)(2)); *see also In re Etchin,* 128 B.R. 662, 665, 25 C.B.C.2d 504 (Bankr.W.D.Wis.1991) (collecting cases). For the reasons which follow, I agree with those cases holding that § 1322(b)(2) does not preclude bifurcation under § 506(a).[9]

█ Section 506(a) is the only provision in the Code which purports to define whether, and to what extent, a claim is "secured." And § 103 states that, with exceptions not relevant here, "chapters 1, 3, and 5 of this title apply in a case under chapter 7, 11, 12, or 13 of this title." A reasonable inference, then, is that the term "secured claim" (or variations thereof) carries the same meaning throughout the Code as that given to it by § 506(a): i.e., that portion of a creditor's total allowed claim which is supported by the value of the collateral securing the claim. Thus when a chapter 11 creditor chooses to designate the unsecured portion of its total claim as a secured claim pursuant to § 1111(b)(2), that subsection provides that *"notwithstanding section 506(a) of this title,* such claim is a secured claim to the extent that such claim is allowed." (emphasis added). The highlighted text clearly implies that the term "secured claim" is ordinarily defined by § 506(a). *See 3 Collier on Bankruptcy* ¶ 506.01 ("With one exception [under § 1111(b)(2)], the term 'secured claim' as used throughout the Code refers to a secured claim as determined under section 506.").

The inference that § 506(a) is definitional is confirmed by the legislative history. The House Report indicates that § 506(a) "separates an undersecured creditor's claim into two parts—he has a secured claim to the extent of the value of his

collateral; he has an unsecured claim for the balance of his claim.... *Throughout the bill, references to secured claims are only to the claim determined to be secured under this subsection, and not to the full amount of the creditor's claim."* H.R.Rep. No. 595, 95th Cong., 1st Sess. 356 (1977) (emphasis added). *See also* S.Rep. 989, 95th Cong., 2d Sess. 68 (1978).

█ Notwithstanding these considerations, some courts take the position that the meaning of the term "secured claim," as used in § 1322(b)(2), is not defined by § 506(a). *See, e.g., In re Doss,* 143 B.R. 952, 954 (Bankr.E.D.Okla.1992). In support of this contention, these courts note the Supreme Court's conclusion that "the words 'allowed secured claim' in § 506(d) need not be read as an indivisible term of art defined by reference to § 506(a), which by its terms is not a definitional provision." *Dewsnup v. Timm,* —— U.S. ——, ——, 112 S.Ct. 773, 777, 116 L.Ed.2d 903, 910 (1992). But *Dewsnup* stands in marked contrast to an earlier opinion of the Court, which characterized § 506 as "govern[ing] the *definition* and treatment of secured claims." *Ron Pair Enters.,* 489 U.S. at 238–39, 109 S.Ct. at 1029 (emphasis added). Moreover, the Court in *Dewsnup* strongly hinted that the term "allowed secured claim" might be defined by § 506(a) when used in provisions other than § 506(d). *Dewsnup,* —— U.S. at —— n. 3, 112 S.Ct. at 778 n. 3, 116 L.Ed.2d at 911 n. 3. *See Bellamy,* 962 F.2d at 182 (*"Dewsnup* did not hold that 'secured claim' in other provisions of the Code was never to be construed as it was in § 506(a). Its analysis was limited to § 506(d) and the facts before it."). Finding nothing in *Dewsnup's* reasoning which compels a contrary interpretation, I agree with *Bellamy* that § 1322(b)(2)'s reference to "secured claims" carries the meaning provided by § 506(a). *Id.* at 182–83. *See also Lomas Mtg. USA v. Wiese (In re Wiese),* 980 F.2d

9. Because I so hold, I need not address the Debtors' contention that the protection afforded by § 1322(b)(2) extends only to traditional home mortgage lenders. *Compare, e.g., In re Shaffer,* 84 B.R. 63, 65 (Bankr.W.D.Va.), *aff'd,* 116 B.R. 60 (W.D.Va.1988), *appeal dismissed,* 912 F.2d 749 (4th Cir.1990) ("[S]hort-term, non-

home related, finance company loans are not within the ... scope of Section 1322(b)(2).") *with, e.g., In re Bradshaw,* 56 B.R. 742, 746 (S.D.Ohio 1985) ("On its face, the statute clearly does not contain any purchase money requirement for a creditor to qualify for the protection given by section 1322(b)(2).").

1279, 1281 (9th Cir.1992); *Sapos v. Provident Inst. of Sav.*, 967 F.2d 918, 924–25 (3d Cir.1992); *In re Sainz–Dean*, 143 B.R. 784, 786–87 (D.Colo.1992); *In re Weber*, 140 B.R. at 711–12; *In re Taras*, 136 B.R. 941, 949–50 (Bankr.E.D.Pa.1992).

■ With the exception that is the subject of this dispute, § 1322(b)(2) provides that a debtor can "modify the rights of holders of secured claims ... or of holders of unsecured claims." Since the provision speaks in terms of "secured" and "unsecured" claims, and since § 506(a) provides the only mechanism for determining whether "[a]n allowed claim of a creditor secured by a lien" is in fact secured for purposes of the Code, the inference I draw is that the term "modification" (whatever that may entail) does not implicate the very process—bifurcation under § 506(a)—that establishes whether a claim is in fact secured. *Cf. Bellamy*, 962 F.2d at 181 ("[W]hether, and the extent to which, one holds a secured claim must in the first instance be determined according to § 506(a)."). If it did, then it could fairly be stated that § 1322(b)(2) gives the debtor the right to, among other things, bifurcate claims that have already been bifurcated.[10]

This inference is supported by the legislative history, which indicates that the term modification was meant to include changes in the "size and timing of installment payments ... or ... other provisions of the secured creditors' contract." *Report of the Commission on Bankruptcy Laws of the United States*, H.R.Doc. No. 137, 93d Cong., 1st Sess. Pt. II at 205 (1973) (*quoted in Bellamy*, 962 F.2d at 182.) Although the foregoing list did not purport to be exhaustive, the passage suggests that bifurcation, which does not *necessarily* result in a change in any contractual provision, does not constitute modification. In any event, it seems improbable that the legislative history would specify relatively modest rights, such as changing the timing of loan payments, but leave unmentioned something as potentially consequential as bifurcation. *Cf. Benitez–Allende v. Alcan Aluminio Do Brazil*, 857 F.2d 26, 35 (1st Cir.1988), *cert. denied*, 489 U.S. 1018, 109 S.Ct. 1135, 103 L.Ed.2d 196 (1989) ("It seems unlikely Congress would have intended to bring about such an important result without even mentioning the matter."). Moreover, the fact that there is no obvious analogue to § 1111(b)(2) in chapter 13 supports the inference that none exists. *See Sapos*, 967 F.2d at 925; *In re Bellamy*, 122 B.R. 856, 860 (Bankr.D.Conn.), *aff'd* 132 B.R. 810 (D.Conn.1991), *aff'd* 962 F.2d 176 (2d Cir.1992).

■ There is another good reason to conclude that modification does not encompass bifurcation. Although the Code does not explicitly define the term, there is no doubt that modification is a right which inures solely to the debtor's benefit. Bifurcation, on the other hand, is a process which occurs at a given point in time by operation of law based on the facts as they existed at that time. *Cf. Hart*, 923 F.2d at 1411 (describing bifurcation as "a recognition of the legal status of the creditor's interest in the debtors' property, [rather than] a modification of the mortgage"). Properly speaking, bifurcation is not a "right" that is exercised at a party's discretion, but rather an "event" which is deemed to have occurred based on the relevant facts. Accordingly, a motion to "determine the value of a claim secured by a lien" under F.R.Bankr.P. 3012 does not oblige the court to decide whether the debtor has a "right" to bifurcate; it instead calls for a determination as to whether bifurcation in fact "happened."

A debtor can of course influence a court's findings at a valuation hearing regarding the extent to which a claim should be allowed as secured under § 506(a), such

---

**10.** There is authority for the proposition that "§ 1322(b)(2) in and of itself provides for a chapter 13 plan's modification of the rights of holders of secured claims in personal property into secured and unsecured claims." *In re Phillips*, 142 B.R. 15, 16 (Bankr.D.N.H.1992). However, the court did not explain why Congress would not only restate in § 1322(b)(2) a process which already applies to chapter 13 via §§ 506(a) and 103, but do so using language that provides no hint that bifurcation is contemplated, and that offers no guidance as to how it is to be accomplished.

as by introducing evidence relating to the collateral's value or establishing the existence of senior liens. But while he can litigate the facts which will determine whether (and in what amounts) a claim is bifurcated, he cannot alter the consequences which flow from those facts.

Thus there is a fundamental, qualitative difference between the modification rights which § 1322(b)(2) seems to contemplate and bifurcation under § 506(a). And this distinction reveals the awkwardness of describing bifurcation under § 506(a) as one of the rights conferred on debtors by § 1322(b)(2): Aside from the fact that the debtor (along with other parties in interest) *already has* such a "right," the contention overlooks the fact that § 506(a) splits an undersecured claim into its secured and unsecured components based on facts that have nothing to do with the debtor's needs or wishes.

Interpreting bifurcation as a form of "modification" also creates problems relating to the "best interests of creditors test" under § 1325(a)(4). That test calls for a determination that the proposed chapter 13 plan will pay each holder of an unsecured claim "not less than the amount that would be paid on such claim if the estate were liquidated under chapter 7." Because § 1322(b)(2) does not apply in chapter 7, the court would logically have to treat the total claim of a creditor protected from bifurcation under that section as bifurcated when determining whether the plan satisfies § 1325(a)(4).[11] Thus interpreting § 1322(b)(2) as precluding bifurcation would not obviate the need for a valuation of the protected creditor's collateral, and would yield the bizarre result of requiring the debtor to pay protected claims as though bifurcation had not occurred and unsecured claims as though it had.

Cases holding that "modification" includes bifurcation have advanced various theories. According to one argument,

> Those who would read the protection of Section 1322(b)(2) as limited to the se-

cured portion of a home mortgage confuse the term "secured claim" with the phrase "claims secured only" by a home mortgage and disregard the difference in the function of the word "secured" in the two phrases. In the phrase "secured claim," the word "secured" is an adjective modifying "claim," so that the entire phrase can legitimately be read as meaning a *wholly* secured claim. In the latter phrase, "a claim secured only by", the phrase "secured *only by*" performs an adverbial function describing a characteristic of the claim, i.e., that it is secured only by a residential mortgage. That a claim is "secured *only by*" a residential mortgage does not mean that it is necessarily a "secured claim."

*In re Strober,* 136 B.R. 614, 619–20, 26 C.B.C.2d 1383 (Bankr.E.D.N.Y.1992), *overruled by Bellamy,* 962 F.2d at 179–81. *See also In re Hynson,* 66 B.R. 246, 253, 15 C.B.C.2d 1323 (Bankr.D.N.J.1986).

▮▮▮▮▮ Thus it appears that *Strober* would paraphrase § 1322(b)(2) as permitting a plan to "modify secured claims, other than any claim secured by a residential mortgage (whether fully or partially secured or even completely underwater), or unsecured claims." This rendition of the statute would be plausible if the reference in § 1322(b)(2) to "unsecured claims" contemplated only those claims which do not relate to a residential mortgage. But there is no support for that conclusion. *See Bellamy,* 962 F.2d at 183 ("It seems that 'unsecured claim' has the same meaning in § 1322(b)(2) as it does in § 506(a)...."); *Hougland,* 886 F.2d at 1183. Because I reject *Strober*'s apparent assumption that an unsecured claim created by bifurcation of a claim secured by a home mortgage is not an "unsecured claim" for purposes of § 1322(b)(2), I also reject that court's interpretation of § 1322(b)(2).

▮▮▮▮ If, on the other hand, *Strober* is suggesting that § 1322(b)(2)'s exception for residential mortgages applies to both secured and unsecured claims, then the flaw

---

**11.** For the view that *Dewsnup* arguably may preclude bifurcating undersecured claims when a court makes the § 1325(a)(4) determination,

*see* M. Howard, *Dewsnupping the Bankruptcy Code,* J.Bankr.L. & P. 513, 519 (July/Aug.1992).

in its interpretation lies in the fact that the excepting language is grammatically linked only to *secured* claims. Given the way in which the statute is structured, a more natural reading is that the exception carved out by the "other than" proviso in § 1322(b)(2) relates only to secured claims. *See Hougland,* 886 F.2d at 1184; *Bellamy,* 962 F.2d at 180–81.

In further support of its interpretation of § 1322(b)(2), *Strober* noted that

Section 506(a) itself distinguishes between a claim "secured by a lien on property" and a "secured claim." Section 506(a) declares that an "allowed claim of *a creditor secured by* a lien on property ... is *a secured claim* to the extent of the value of such creditor's interest in the estate's interest in such property." Thus, the "claim of a creditor secured by a lien on property" is not necessarily a "secured claim."

136 B.R. at 620. This argument implies that the omission of the adjective "secured" preceding "claim" in § 1322(b)(2)'s excepting clause was a substantive choice made to avoid using a term of art—"secured claim"—that is defined by § 506(a). But even if that omission reflects a considered decision of the drafters (and there is no evidence that it does), the more likely explanation for the omission is that the adjective was viewed as redundant. *Cf. Hougland,* 886 F.2d at 1184 ("Congress need not create such an awkward and wooden sentence structure.").

Another argument is that the Code's legislative history supports the conclusion that § 1322(b)(2) precludes bifurcation of claims protected from modification. In particular, *Strober* found significance in the fact that an early draft of § 1322(b)(2) "require[d] that the [protected] claim be *'wholly* secured by [a] mortgage,'" whereas the bill as enacted "require[d] that it be a claim 'secured *only* by a security interest in real property.'" *Strober,* 136 B.R. at 621–22. According to that court, "[t]here would have been no purpose in the change from 'wholly' to 'only' had the Code's draftsmen considered Section 506(a) as allowing the modification of a mortgage to the extent

that it was not a wholly secured mortgage, even though it was the creditor's only security.". *Id.* at 622. Thus the purpose of the change "must have been ... [to] eliminat[e] the requirement that the mortgage be *wholly* secured in order to qualify for exemption from modification." *Id.*

■ *Strober* overlooks the possibility that the drafters of § 1322(b)(2), mindful of the fact that secured claims are by definition fully secured pursuant to § 506(a), might well have decided to drop the adverb "wholly" as redundant. Restricting the protection under § 1322(b)(2) to claims secured *only* by a mortgage, on the other hand, was presumably designed to insure that the protection is limited to conventional mortgage loans rather than, say, a loan in which the creditor takes a lien on the debtor's home and everything else the debtor owns. *See, e.g., In re Wright,* 128 B.R. 838, 842, 25 C.B.C.2d 447 (Bankr.N.D.Ga. 1991) ("[W]here a creditor's security interest encompasses personalty in addition to the debtor's principal residence, the antimodification exception of § 1322(b)(2) will not apply."). I therefore disagree with *Strober*'s conclusion regarding the implications of this revision. *Cf. Wilson,* 895 F.2d at 128 ("The slight difference in language ... does not appear to have been given any significance [by Congress].").

Although courts have pointed to other portions of the legislative history as evidence that bifurcation is a form of modification, *see, e.g., Nobleman,* 968 F.2d at 488–89; *Hynson,* 66 B.R. at 252, the history cited only reaffirms that which is obvious from the text of § 1322(b)(2)—namely, that that section was designed to protect home mortgage lenders. *Bellamy,* 962 F.2d at 182; *Hougland,* 886 F.2d at 1185. The issue here is whether that protection includes protection against bifurcation. And the legislative history is silent with respect to that issue. *Id.*

Some courts have interpreted this silence as a sign that Congress intended to preserve the same protection for home mortgage lenders as existed for all secured creditors in chapter XIII, which was the equivalent to chapter 13 under the former

Bankruptcy Act, 11 U.S.C. § 1 *et seq.* (repealed). *See In re Mitchell,* 125 B.R. 5, 8 (Bankr.D.N.H.1991); *In re Kaczmarczyk,* 107 B.R. 200, 203, 22 C.B.C.2d 328 (Bankr. D.Neb.1989). That argument might carry some weight if the Bankruptcy Act or the case law thereunder defined bifurcation as a form of "modification." But that issue did not arise under the Act because § 1322(b)(2) does not have a close pre-Code analogue: as *Kaczmarczyk* itself noted, the protection afforded to chapter XIII secured creditors derived from the statutory definition of "claim" and the requirement that such creditors consent to the terms of a proposed reorganization plan. *Id.* at 202–03.[12] Thus pre-Code practice sheds no light on the question of whether bifurcation is a form of modification. *Cf. Union Bank v. Wolas,* — U.S. —, —, 112 S.Ct. 527, 532, 116 L.Ed.2d 514, 523 (1991) ("[T]he fact that Congress carefully reexamined and entirely rewrote the preference provision in 1978 supports the conclusion that [the provision's apparent departure from pre-Code law] reflects the deliberate choice of Congress.").

■ In holding that § 1322(b)(2) precludes bifurcation of claims secured by home mortgages, *Strober* noted that "the responsible Senate subcommittee had heard testimony from a representative of the mortgage banking industry deploring lien stripping (which the courts had recently sanctioned under Chapter XII of this Code's predecessor) and expressing serious apprehension about the effect of lien stripping, if permitted in Chapter 13, on the availability of home mortgage money." *Strober,* 136 B.R. at 620. *See also In re Schum,* 112 B.R. 159, 162 n. 3 and accompanying text (Bankr.N.D.Tex.1990). But the goal of the courts in interpreting stat-

utes is to determine what the legislature intended, not what lobbyists wanted. And at least when, as in this case, a proposed statute is subject to give-and-take among competing concerns,[13] there is no reason to assume that an interest group's "wish list" and Congressional intent are one and the same. *See Harry Fox Agency v. Mills Music,* 543 F.Supp. 844, 864 (S.D.N.Y.1982), *rev'd,* 720 F.2d 733 (2d Cir.1983), *rev'd sub nom. Mills Music v. Snyder,* 469 U.S. 153, 105 S.Ct. 638, 83 L.Ed.2d 556 (1985) ("[S]tatements made at committee hearings by representatives of various interests are entitled to little if any weight in interpreting Congressional intent.").

Another justification for prohibiting bifurcation of claims protected by § 1322(b)(2) is that that section, being specific to chapter 13, should prevail over § 506(a), which "is a provision of general applicability in cases under Chapter 7, 11, 12 and 13 of the bankruptcy code." *Nobleman,* 968 F.2d at 488. *See also In re Barnes,* 146 B.R. 854 (Bankr. W.D.Okla.1992); *Mitchell,* 125 B.R. at 6; *Hynson,* 66 B.R. at 249. The problem with this argument is that it assumes the point in controversy. If "modification" includes bifurcation, then § 506(a) and § 1322(b)(2) are in conflict. For the reasons stated, however, I do not believe that bifurcation is a form of modification, and so § 1322(b)(2)'s exception clause does not apply. Because there is no conflict between the two provisions, there is no need to resort to rules according preferential status to specific statutory provisions over general ones.[14]

■ Ironically, then, those courts which purport to be reconciling a conflict between § 506(a) and § 1322(b)(2) are actually creat-

---

**12.** At least in some jurisdictions, however, the protection enjoyed by these creditors was not absolute. *See infra* note 26 and accompanying text.

**13.** The obvious countervailing consideration here is the Code's objective of facilitating the debtor's "fresh start." And Congress may well have decided that the possibility of creating marginally more conservative lending practices—an outcome predicted by a representative of the mortgage lenders should chapter 13 strip

down of home mortgages be permitted, *see Strober,* 136 B.R. at 621—was not such a terrible price to pay in achieving that objective.

**14.** Even if such a rule were relevant, I believe *Nobleman* and the other cases cited have it backwards. Section 506(a) deals specifically and directly with the treatment in bankruptcy of undersecured claims. Section 1322(b)(2), on the other hand, provides generally that certain chapter 13 claims are not to be modified, a term which the Code leaves undefined.

ing one. Construing § 1322(b)(2) as precluding bifurcation implicitly rewrites § 506(a) and/or § 103 to provide that certain classes of claims are not bifurcated in chapter 13. Such a construction therefore violates a basic tenet of statutory interpretation to the effect that statutes are to be read harmoniously whenever feasible. *Earle v. Carson*, 188 U.S. 42, 47, 23 S.Ct. 254, 47 L.Ed. 373 (1903); *Bellamy*, 962 F.2d at 181; *In re Briggs*, 143 B.R. 438, 446 n. 9 (Bankr.E.D.Mich.1992).

■ Some anti-bifurcation courts contend that § 1322(b)(2)'s protection against modification would be all but meaningless if that protection did not extend to bifurcation. *See, e.g., In re Sauber*, 115 B.R. 197, 199 (Bankr.D.Minn.1990) ("By focusing on the terms 'secured claim' and 'unsecured claim', and by using § 506(a) definitions, *Hougland* judicially removes most of the protection that [§ 1322(b)] provides."); *Hynson*, 66 B.R. at 252; *see also Hart*, 923 F.2d at 1417 (Brorby, J., dissenting). If § 1322(b)(2) had no discernible role to play other than preventing claim bifurcation, this argument would have more merit. But that is not the case, since a protected creditor can in any event use § 1322(b)(2) to block confirmation of any plan involving payment terms—e.g., concerning the applicable interest rate or monthly payment amount—that are less favorable to it than those specified in the creditor's contract with the debtor. *See Sapos*, 967 F.2d at 926; *Wilson*, 895 F.2d at 128; *Bellamy*, 132 B.R. at 813; *Franklin*, 126 B.R. at 711–712; *In re LaLonde*, 65 B.R. 237, 239, 14 B.C.D. 1272 (Bankr.S.D.Ohio 1986); *In re Owens*, 36 B.R. 661, 662 (Bankr. M.D.Tenn.1984). And what little legisla-

tive history there is regarding the meaning of the term "modification" suggests that that is exactly the role § 1322(b)(2) was designed to play. *See supra* p. 164. Thus while one might question whether protection of only the residential mortgagee's post-bifurcation secured claim is "sufficient," the only answer that counts is that Congress apparently thought so.

Further support for this conclusion is provided by the text of § 1322(b)(2) itself, which permits debtors to modify the rights of "holders of unsecured claims." Since the quoted language presumably includes claims that do not involve a lien, Congress evidently thought that the term modification encompassed significant rights other than the right to bifurcate an undersecured claim.

Another argument mustered in support of the contention that § 1322(b)(2) precludes modification is "that compliance with Section 1325(a)(5)[15] is incompatible with bifurcating a residential mortgage." *Strober*, 136 B.R. at 623–24. The court's reasoning is as follows:

A Chapter 13 plan that meets the requirements of Section 1322(b)(5)[16] escapes successful challenge under Section 1325(a)(5) because "cure under § 1322(b)(5) is not a modification of the mortgagee's rights." *Landmark Fin. Serv. v. Hall*, 918 F.2d 1150, 1154 (4th Cir.1990), *citing* 5 *Collier on Bankruptcy*, ¶ 1322.09[4] (15th ed. 1986). But the same is not true of a plan predicated on bifurcation.... [I]f the mortgagee's claim were bifurcated and the mortgagee refused to accept the Chapter 13 plan, then if the debtor wished to retain his home, [§ 1325(a)(5) would require the

---

**15.** Section 1325(a)(5) states:

(a) Except as provided in subsection (b), the court shall confirm a plan if—

. . . . . .

(5) with respect to each allowed secured claim provided for by the plan—

(A) the holder of such claim has accepted the plan;

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed under the

plan on account of such claim is not less than the allowed amount of such claim; or

(C) the debtor surrenders the property securing such claim to such holder....

**16.** Section 1322(b)(5) states that, notwithstanding § 1322(b)(2), the plan may "provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due."

debtor] to distribute under the plan to the mortgagee not less than the allowed amount of the secured portion of the bifurcated claim.... Since a plan may not last more than five years, that amount would have to be paid off during that period of time. [footnote omitted] The Strobers suggest that they are ready to meet the requirements of Section 1325(a)(5) by a balloon payment in the fourth year, but whether such a plan would qualify for confirmation as feasible [footnote omitted] is most dubious. Like the Strobers, few debtors would have the capacity to pay off their entire mortgage, within a five year period, through regular monthly payments, even when reduced by bifurcation to the present value of the debtor's residence.

*Strober*, 136 B.R. at 623. *See also In re Davidoff*, 136 B.R. 567, 569 (Bankr. M.D.Fla.1992) ("[I]t is completely impractical for [valuation pursuant to § 506] to be allowed since in the majority of cases such valuation may run afoul of Section 1322(b)(5), which requires a debtor to pay off secured claims within three to five years of confirmation of the Chapter 13 plan. Clearly, such a frustrating conclusion to an allowed modification ... has not been envisioned.").

 There are two problems with this analysis. First and foremost, *Strober* cites no support for the premise that a protected claim which has been bifurcated cannot be cured and maintained pursuant to § 1322(b)(5).[17] *Landmark* does not explicitly so state, and I am not aware of any other authority for that proposition. Since I see no reason why bifurcated home-mortgage claims cannot be cured in the same manner as other long-term debts, I reject *Strober's* premise. As stated by the court in *Bellamy*,

Section 1322(b)(5) addresses, as does the Code in general, secured and unsecured *claims*. In light of the goals of Chapter 13, § 1322(b)(2) and (5) must be read as allowing a debtor to reinstate in its stripped down form a residential mortgage that comes due beyond the life of the plan. The debtor must cure arrearages within a reasonable time, *see* § 1322(b)(5), but need make scheduled mortgage payments only until the secured claim is fully paid. [citations omitted] Such treatment of a residential mortgage lender's secured claim is neither a modification prohibited by § 1322(b)(2) nor does it implicate [section] 1325(a)(5)(B)....

962 F.2d at 185. *See also Franklin*, 126 B.R. at 712 ("If the stream of payments necessary to satisfy the [post-bifurcation] allowed secured [home-mortgage] debt exceeds the life of the plan, the plan must provide for the curing of all existing arrearages, consistent with § 1322(b)(5).").

Even if *Strober* were correct in its assumption that bifurcated home mortgages must be paid off within the life span of the plan, I disagree with the court's contention that that fact warrants the conclusion that § 1322(b)(2) precludes bifurcation of protected claims. First, I believe *Strober's* doubts regarding the likelihood that a debtor can pay off the stripped-down mortgage within five years are overstated. For any number of reasons, a mortgagee's post-bifurcation allowed secured claim may be relatively small, in which case the debtor's compliance with § 1325(a)(5)(B)(ii) would not necessarily be all that onerous. *See, e.g., Kaczmarczyk*, 107 B.R. at 203 (secured claim would be only $2,000). Indeed, as is true here with respect to NBD's claim, the effect of § 506(a) will often be to reduce the mortgagee's allowed secured claim to zero. Nor would I characterize

---

**17.** An issue may arise as to whether any arrearages can be allocated to the secured portion of the mortgagee's total claim. *See Sapos v. Provident Inst. of Sav.,* 967 F.2d 918, 928 (3d Cir. 1992) ("[A]rrearages do not qualify as a 'secured claim' subject to a section 506(a) cramdown...."). But *Sapos* does not suggest that § 1322(b)(5) is inapplicable to bifurcated home mortgage claims. *See id.* ("[A] debtor who bifurcates an allowed claim under section 506(a) can use the cure and maintenance provision of section 1322(b)(5) only if the debtor both pays arrearages within a reasonable time and continues to make the monthly payments due in accordance with the original terms of the note until the principal has been paid in an amount equal to the value of the property established under section 506(a).").

the feasibility of a chapter 13 plan which contemplates a balloon payment as "most dubious." *Cf. In re Gregory,* 143 B.R. 424, 426 (Bankr.E.D.Tex.1992) ("[T]he inclusion of a balloon payment scheme in a plan is not dispositive of a plan's feasibility.").

More to the point, I question the validity of the inference *Strober* draws from its conclusion that "few debtors would have the capacity to pay off their entire mortgage within a five year period, ... even when reduced by bifurcation." *Strober*'s rationale is that "[t]he fact that compliance with Section 1325(a)(5) is incompatible with bifurcating a residential mortgage into secured and unsecured segments argues against reading Section 506(a) as compelling that result." 136 B.R. at 623–24. But if anything, *Strober*'s observation regarding § 1325(a)(5), if correct, would compel a contrary conclusion. After all, if only a statistically insignificant number of debtors could comply with § 1325(a)(5)(B)(ii), then the likelihood that Congress was concerned about protecting residential mortgage lenders from § 506(a) is diminished: there would be no great need to protect these creditors from bifurcation because only a few chapter 13 debtors could take advantage of it.

*Strober* also noted that § 1328(a) excepts from discharge "any debt—(1) provided for under section 1322(b)(5)," but does not except from discharge those long-term debts which "are not covered by Section 1322(b)(5)." 136 B.R. at 624. According to *Strober*, "[t]he lack of another exception to the general discharge rule of Section 1328(a) is further evidence that Congress did not envisage modifications of long term debt." *Id.*

This argument is premised on the assumption that a bifurcated home-mortgage debt cannot be cured and maintained pursuant to § 1322(b)(5). Because I reject the premise, I likewise reject the argument upon which it is based. But I reject the argument for another reason as well. If *Strober* is correct that a bifurcated home mortgage claim must be paid off within five years, then the omission in § 1328(a) of any exception for debts treated in this manner is not the least bit troubling: there obviously would be no reason to except from discharge a debt giving rise to a claim that is fully paid pursuant to, and within the life span of, a confirmed plan.

*Strober* voiced concerns about the status of a stripped-down home mortgage should the debtor fail to comply with the terms of the confirmed plan. *Id.* But concerns of this sort are not unique to home mortgages or, for that matter, chapter 13. So unless *Strober* is suggesting that no claim should ever be bifurcated for purposes of any plan of reorganization, I fail to see the relevance of these concerns to the question of whether a chapter 13 debtor can bifurcate a claim secured by a home mortgage.

Some courts which do not allow bifurcation of a home-mortgage claim have adopted the following reasoning:

[S]ection 1322(b)(2) describes its subject matter as the modification of "the *rights of holders* of" claims, not as the modification of *claims* as such.... Therefore, even if the entirety of such a claim is not a secured claim (as per section 506(a)), the rights of a holder of such a claim may not be modified under section 1322(b)(2).

*Nobleman,* 968 F.2d at 488. *See also Etchin,* 128 B.R. at 666; *Sauber,* 115 B.R. at 199.

As noted by the court in *Bellamy,* such a construction "would be directly contrary to one of the Code's cornerstones, aimed at making a fundamental change from the Bankruptcy Act, that treatment under the Code turns on whether a *claim* is secured or unsecured, not on whether a *creditor* is secured or unsecured." *Bellamy,* 962 F.2d at 179. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 181 (1977) ("By addressing the problem in terms of claims, the bill makes clear that an [under]secured creditor is to be treated as having a secured claim to the extent of the value of the collateral, and an unsecured claim for the balance of his claim against the debtor."). Rather than representing a subtly stated exception to this rule, then, the language in § 1322(b)(2) is best interpreted as reflecting a stylistic, not a substantive choice: Since § 1322(b)(2)

deals with the modification of rights, and since it is awkward to describe a "claim" as having rights, reference to the rights of the person holding the claim was probably viewed as the simplest and clearest way of drafting the provision.

Aside from deviating from a basic principle underlying the Code, reading § 1322(b)(2) as protecting creditors, rather than claims, would generate other problems. How does one reconcile such an interpretation with the fact that § 507(d), which also makes reference to the rights of a "holder" of a claim, clearly refers only to those rights arising from the claim itself? *Cf., e.g.,* 11 U.S.C. §§ 724(b) and 1222(a)(3) (referring to holders of claims, with the focus again clearly on the claim held by the entity, not the entity holding the claim).[18] Suppose the same creditor holds a claim protected from bifurcation and an unrelated, unsecured claim. Which portion of § 1322(b)(2) prevails—the part that says that the rights of such a claimant cannot be modified, or the part stating that its rights can be modified? What is to prevent unprotected claimants from assigning their claims to a protected claimant, so that the debtor could not modify any claims?[19] Is there any logic to the notion that a "holder" of, say, a $100,000 claim secured by a home mortgage to the extent of $50 (after allowing for senior liens) is protected from bifurcation, but not if the senior liens exceed the home's value?[20] *Cf. Kaczmarczyk,* 107 B.R. at 204 (holding that

§ 1322(b)(2) does not "protect the holder of a junior mortgage ... when the holder's claim is not secured to any extent under § 506(a)"). In light of these considerations, I agree with *Bellamy* that "the 'rights' which may not be modified under § 1322(b)(2) must be defined in terms of the claim, not with reference to the status of the claimant." 962 F.2d at 180.

Based on the foregoing, I conclude that for purposes of § 1322(b)(2), the term "modification" does not encompass bifurcation pursuant to § 506(a). Accordingly, the protection from modification afforded by § 1322(b)(2) does not extend to the bifurcation of claims under § 506(a).

### B. Is a lien subject to avoidance to the extent that it does not secure an allowed secured claim as defined in § 506(a)?

Having concluded that NBD's and Foley's claims are bifurcated by § 506(a),[21] the next question is whether their respective liens are subject to partial or total avoidance. Any right on the Debtor's part to invalidate liens in this fashion arguably could emanate from (i) § 1322(b)(2), (ii) § 506(d) (the Debtors' contention), or (iii) § 1325(a)(5)(B). These theories will be discussed *seriatim.*

#### (i) Section 1322(b)(2)

A number of courts have suggested that "modification" for purposes of

---

18. *See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs.,* 484 U.S. 365, 371, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear....").

19. If the assignment is made post-petition, the ploy could be foiled by ruling that the assignee's rights are fixed as of the date the bankruptcy petition was filed. *Cf. In re Dinsmore,* 141 B.R. 499, 505–06, 27 C.B.C.2d 785 (Bankr.W.D.Mich. 1992) ("Looking to the date of filing is proper to discourage creditors from disclaiming security interests post-petition or attempting other tactics to defeat the debtor's ability to modify the treatment of claims."). But under that analysis, protected creditors who "purchase" claims at a discount from unprotected creditors by means

of assignments executed on the eve of bankruptcy could still benefit from the immunity provided by § 1322(b)(2).

20. This criticism assumes that there would first be a § 506(a) valuation to determine if the creditor is in fact the "holder" of a "secured claim." If *Nobleman* is suggesting that § 1322(b)(2) protects home lenders even if their lien has no economic value, then its conclusion is faulty because § 1322(b)(2)'s protection extends only to certain classes of "secured claims," *see supra* pp. 165–66, and the only definition in the Code for that term is found in § 506(a), *see supra* pp. 163–64.

21. With respect to NBD's claim, the term "bifurcation" is a bit of a misnomer, since the effect of § 506(a) is to render its entire claim unsecured.

§ 1322(b)(2) includes the right to invalidate liens as they relate to post-bifurcation allowed unsecured claims, even though the plan does not provide that the unsecured claim be fully paid. *See In re McDade,* 148 B.R. 42, 44 (Bankr.S.D.Ill.1992); *In re Avret,* 146 B.R. 47, 50–51 (Bankr.S.D.Ga. 1992); *In re Leverett,* 145 B.R. 709, 712–13, 23 B.C.D. 843 (Bankr.W.D.Okla.1992); *In re Murry–Hudson,* 147 B.R. 960, 962 (Bankr.N.D.Cal.1992); *cf. In re Dyer,* 142 B.R. 364, 370–71, 27 C.B.C.2d 661 (Bankr. D.Ariz.1992) (avoidance pursuant to § 506(d) of residential mortgagee's lien "is inconsistent with … [§] 1322(b)(2)"). For the reasons which follow, however, I do not believe that § 1322(b)(2) is a lien-stripping provision.

The theory that lien invalidation is authorized by § 1322(b)(2) suffers from many of the same infirmities afflicting the bifurcation-as-modification school of thought. In particular, I see no reason why Congress would carefully and explicitly specify in § 506 the circumstances under which a lien can be invalidated, only to redefine (or perhaps eliminate) the ground rules—using the vaguest of terms—in § 1322(b)(2). Moreover, the legislative history gives no indication that lien stripping is within the scope of § 1322(b)(2). *See supra* p. 164.

But there is an even bigger problem with this theory. Section 1322(b)(2) permits a debtor to modify the rights of all creditors holding secured or unsecured claims (other than residential mortgages), making no distinction whatsoever between that portion of the claim which is truly secured by the collateral's value and that which is not. Thus, if avoiding liens is an example of the kind of "modification" permitted by that section, § 1322(b)(2) would in effect allow debtors to invalidate *all* liens (other than residential mortgages), not just those which are underwater. Since such an interpretation directly contradicts § 1325(a)(5)(B), and since statutes should be harmonized whenever possible, *see supra* p. 168, the better view is that lien stripping is not a permissible form of "modification" under § 1322(b)(2).

#### (ii) *Section 506(d)*

As previously noted, § 506(d) provides that, with exceptions that are not applicable here, a creditor's lien is void if it "secures a claim against the debtor that is not an allowed secured claim." For the reasons stated earlier, I believe that the foregoing reference to "allowed secured claim" is defined by § 506(a). If that is the case, then a straightforward application of § 506(d) would mandate the conclusion that the liens of NBD and Foley are void to the extent that their total claims exceed the amount by which the claims are deemed secured under § 506(a). I cannot reach that conclusion, however, without considering a contrary interpretation of § 506(d) adopted by the Supreme Court in *Dewsnup, supra* p. 163.

In *Dewsnup,* a chapter 7 debtor sought a ruling that part of an undersecured creditor's lien was void under § 506(d). The Court ruled against the debtor, accepting instead the creditor's argument that "the words 'allowed secured claim' in § 506(d) … should be read term-by-term to refer to any claim that is, first, allowed, and, second, secured." —— U.S. at ——, 112 S.Ct. at 774, 116 L.Ed.2d at 910. Since the creditor's claim was "secured by a lien and [had] been fully allowed pursuant to § 502," *id.* at ——, 112 S.Ct. at 774, 116 L.Ed.2d at 911, the lien was not invalidated by § 506(d).

If *Dewsnup*'s interpretation of "allowed secured claim" applies in this case, then the Debtors cannot use § 506(d) to invalidate the liens held by NBD and Foley: after all, both hold claims that were "fully allowed pursuant to § 502." Thus the critical issue here boils down to whether the meaning of the operative term in § 506(d) is supplied by *Dewsnup* or § 506(a).

*Dewsnup* is of course binding in all chapter 7 cases involving a debtor seeking to invalidate a lien pursuant to § 506(d). And since it is generally safe (and always reasonable) to assume that the meaning of words used in a statutory provision remain unchanged regardless of the factual context in which the statute is applied, it is not surprising that *Dewsnup*'s interpretation

of § 506(d) has been extended to chapter 13, *see, e.g., Dyer*, 142 B.R. at 369; *Davidoff*, 136 B.R. at 569, and chapter 11, *see In re Blue Pacific Car Wash*, 150 B.R. 434, 435 (W.D.Wis.1992); *In re Taffi*, 144 B.R. 105, 114, 23 B.C.D. 599 (Bankr.C.D.Cal. 1992).

But in my view the foregoing cases failed to heed *Dewsnup*'s own caveat indicating that its holding would not necessarily obtain outside of chapter 7. *See Dewsnup*, — U.S. at —, 112 S.Ct. at 778, 116 L.Ed.2d at 911 ("Hypothetical applications ... illustrate the difficulty of interpreting the statute in a single opinion that would apply to all possible fact situations. We therefore focus on the case before us and allow other facts to await their legal resolution on another day."). These courts also overlooked the significance of the Court's observation that, *"[a]part from reorganization proceedings*, see 11 U.S.C. §§ 616(1) and (10) (1976 ed) [11 U.S.C. §§ 616(1) and (10) ], no provision of the pre-Code statute permitted involuntary reduction of the amount of a creditor's lien for any reason other than payment on the debt." *Id.* at —, 112 S.Ct. at 779, 116 L.Ed.2d at 912 (emphasis added).[22] This latter passage is noteworthy because it implies that the Court's interpretation of § 506(d) might not be applicable in chapter 11, the successor to the Act's chapter X (which included § 616). And even a cursory review of the implications should *Dewsnup* be extended to chapter 11 vividly demonstrates why the Court was so circumspect.

As the Court itself implicitly acknowledged, categorically prohibiting lien stripping in chapter 11 would disrupt established pre-Code law. More to the point, such a result would be contrary to the intent of Congress when it enacted chapter 11 in 1978.

Under the Act, debtors in chapter XII (which, like chapters X and XI, was a predecessor to chapter 11), could redeem over-encumbered property pursuant to § 461(11) by paying the undersecured creditor an amount equal to the property's value. *See, e.g., In re Pine Gate Assocs.*, 2 B.C.D. 1478, 1491 (Bankr.N.D.Ga.1976); *In re Accousti*, 2 B.C.D. 1093, 1094 (Bankr.D.Conn. 1976).[23] This cramdown authority was preserved under the Code in the guise of § 1129(b)(2)(A)(i), which permits plan confirmation notwithstanding the nonacceptance of an impaired class of secured claims so long as

> (I) ... the holders of such claims retain the liens securing such claims ... to the extent of the allowed amount of such claims; and

> (II) ... each holder of a claim of such class receive ... deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property....

■ The Code's legislative history makes clear that the lien to be retained pursuant to § 1129(b)(2)(A)(i) secures only the allowed secured claim, so that a debtor's plan can provide for the invalidation of underwater liens without running afoul of that subsection:

> Under clause (i) the plan may be confirmed if the class retains ... a lien securing the allowed secured claims of the class and the holders will receive payments of a present value equal to the allowed amount of their secured claims. Contrary to electing classes of secured creditors who retain a lien under subparagraph (A)(i)(I) to the extent of the entire claims secured by such lien, *nonelecting*

---

**22.** If the Court meant to suggest here that § 616 was the only Act provision which authorized lien stripping, then it was clearly in error. *See infra* note 23 and accompanying text (discussing § 461 of the Act and cases decided thereunder).

**23.** Although there is authority for the proposition that a debtor could not utilize § 461(11) as a lien-stripping provision, courts reached that conclusion based on the so-called "absolute pri-

ority rule," which generally precludes the debtor from retaining an interest in estate property unless all claims are fully paid. *See In re Hobson Pike Assocs.*, 3 B.C.D. 1205, 1209 (Bankr. N.D.Ga.1977). And since Congress amended chapter XII in 1952 to "repeal[ ] the 'fair and equitable' test and the inclusive 'absolute priority rule,'" the theoretical underpinning of these decisions was removed. *Id.*

*creditors retain a lien on collateral only to the extent of their allowed secured claims and not to the extent of any deficiency,* and such secured creditors must receive present or deferred payments with a present value equal to the allowed secured claim, which in turn is only the equivalent of the value of the collateral under section 506(a).

*Any deficiency claim of a nonelecting class of secured claims is treated as an unsecured claim* and is not provided for under subparagraph (A).

. . . . .

Contrary to an "electing" class to which section 1111(b)(2) applies, *the nonelecting class need not be protected with respect to any future appreciation [in the value of the collateral* since the se-]cured claim of such a class is never undersecured by reason of section 506(a). Thus the lien secures only the value of [the] interest of such creditor in the collateral. To the extent deferred payments exceed that amount, they represent interest. *In the event of a subsequent default, the portion of the face amount of deferred payments representing unaccrued interest will not be secured by the lien.*

124 Cong.Rec. S17421 (daily ed. Oct. 6, 1978), *reprinted in* App. 3, *Collier on Bankruptcy* X–43 to X–44 (emphasis added; bracketed language added to correct apparent typographical error—*cf.* Norton Bankr.Code Pamphlet 1992–1993 Ed., p. 852).

▮▮▮ As the foregoing excerpt from the legislative history indicates, an undersecured creditor can defend itself against strip down by making the § 1111(b)(2) election, which generally permits the creditor to maintain secured status with respect to its entire claim, rather than in an amount equal only to the collateral's value. *See In re 266 Washington Assocs.,* 141 B.R. 275, 283–84, 23 B.C.D. 41, 27 C.B.C.2d 228 (Bankr.E.D.N.Y.), *aff'd,* 147 B.R. 827 (E.D.N.Y.1992). An even more effective

source of creditor protection from strip down is § 1129(b)(2)(B)(ii), which is a codification of the judicially created absolute priority rule. Citing this latter subsection, courts have ruled that chapter 11 debtors cannot retain property pursuant to the terms of a proposed plan unless all claims are fully paid—including the post-bifurcation unsecured claims of undersecured creditors. *See, e.g., In re Drimmel,* 108 B.R. 284, 288–89 (Bankr.D.Kan.1989), *aff'd,* 135 B.R. 410, 22 B.C.D. 622 (D.Kan.1991); *In re Winters,* 99 B.R. 658, 664, 19 B.C.D. 625 (Bankr.W.D.Pa.1989); *In re AG Consultants Grain Div.,* 77 B.R. 665, 677 (Bankr.N.D.Ind.1987); *In re Sullivan,* 26 B.R. 677, 680, 7 C.B.C.2d 513 (Bankr. W.D.N.Y.1982). Two important points should be made with respect to these limitations on the chapter 11 debtor's ability to invalidate underwater liens.

The first is that Congress clearly intended that, so long as § 1111(b)(2) is not implicated and § 1129(b)(2)(B)(ii) is not violated, a chapter 11 debtor may strip down liens held by undersecured creditors. Applying the result in *Dewsnup* in chapter 11 cases would frustrate that intent.[24]

The second point relates to chapter 12. The major objective of this chapter, enacted in 1986, was to "help[ ] family farmers to keep their farms" in the midst "of a nationwide farm crisis." 132 Cong.Rec. H9001 (daily ed. Oct. 2, 1986), *reprinted in* App. 4, *Collier on Bankruptcy* XXII–10. The ability of such farmers to strip down liens was apparently regarded as an important means of achieving that objective and, because §§ 1111(b)(2) and 1129(b)(2)(B)(ii) were viewed as almost insurmountable obstacles for a debtor wishing to effectuate a stripdown, Congress made the considered determination that there would be no such analogous provisions in chapter 12. *See* 132 Cong.Rec. S15084 (daily ed. Oct. 3, 1986), *reprinted in* App. 4, *Collier on Bankruptcy* XXII–38 to XXII–39; ("The ability to reduce secured claims to the value of their collateral under a plan has been

---

**24.** Extending *Dewsnup* to chapter 11 would also render superfluous the § 1111(b)(2) election.

*See* Howard, *supra* note 11, at 521.

substantially eroded by the enactment of section 1111(b) as part of our new reorganization concepts in chapter 11.... This concept should be deleted from any family farmer reorganization act."); *id.* at XXII–45 ("It seems clear to this writer that any farmer relief statute will have to omit the rule of absolute priority and allow the farmer-debtor to 'scale down' secured debts against his farm and gain a discharge of excess liabilities, similar to the relief available to farmers under section 75 and Chapter XII of the old Bankruptcy Code."); [25] *id.* at XXII–59, XXII–61 (where Senator DeConcini, in expressing "reservations about some parts of the [legislation], noted that the "bill by not including the doctrines embraced by 1111(b) of the bankruptcy code has precluded a creditor from any hope of participating in an upswing in the value of its collateral"). Thus *Dewsnup*, if applied in chapter 12, would preclude debtors from utilizing that chapter for a purpose which Congress endorsed.

In short, then, the extension of the Court's holding in *Dewsnup* to chapters 11 or 12 would be highly problematic. It was presumably this concern that motivated the Court to expressly limit its decision to the particular facts before it, thereby leaving open the distinct possibility that, however unconventional the approach might be, the Court may well interpret § 506(d) differently if the party invoking the statute is someone other than a chapter 7 debtor. Therefore it is incumbent upon me to determine whether the considerations cited by *Dewsnup* in support of its conclusion are equally applicable in this case. *Cf. In re Pearson,* 917 F.2d 1215, 1216 (9th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 1291, 117 L.Ed.2d 514 (1992) ("[r]eading the tea leaves" to anticipate how the Supreme Court would rule on the issue before it).

The primary ground for the result in *Dewsnup* was the fact that strip down was not permitted under the former Bankruptcy Act except in reorganization proceedings. The Court explained its rationale as follows:

> [T]his Court has been reluctant to accept arguments that would interpret the Code ... to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history.... Of course, where the [statutory] language is unambiguous, silence in the legislative history cannot be controlling. But, given the ambiguity here, to attribute to Congress the intention to grant a debtor the broad new remedy against allowed claims to the extent that they become "unsecured" for purposes of § 506(a) without the new remedy's being mentioned somewhere in the Code itself or in the annals of Congress is not plausible....

—— U.S. at ——, 112 S.Ct. at 779, 116 L.Ed.2d at 912–13.

Thus *Dewsnup* based its interpretation of § 506(d) on the fact that pre-Code law did not permit liquidating debtors to effectuate lien stripdowns. Accordingly, I must consider pre-Code practice as it related to what is now chapter 13.

The predecessor under the Bankruptcy Act to chapter 13 was chapter XIII. Like debtors in "straight" bankruptcy, debtors who filed under chapter XIII also could not strip down a lien without the lienholder's consent. *See supra* p. 167. The analysis in *Dewsnup* therefore requires me to look for evidence that Congress did indeed intend to grant chapter 13 debtors the unilateral right to invoke this "broad new remedy." —— U.S. at ——, 112 S.Ct. at 779, 116 L.Ed.2d at 913.

 That evidence exists in the form of § 1325(a)(5)(B), which allows for plan confirmation notwithstanding a secured creditor's nonacceptance, so long as

---

**25.** These quotes are from an article prepared by a member of the National Bankruptcy Conference, in response "to a special request from counsel for the Committee on the Judiciary of the United States Senate to comment on the proposed family farmer bankruptcy bills." *Id.* at XXII–18. One of the proponents of the bill which created chapter 12 remarked from the Senate floor that the article "contains a detailed analysis of existing bankruptcy laws, and persuasively argues that these laws are inadequate for family farmers. I am confident that we have here taken a step to remedy this inadequacy." *Id.* at XXII–17.

176

(B)(i) the plan provides that the holder of [the allowed secured] claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim....

11 U.S.C. § 1325(a)(5)(B). The fact that the foregoing provision refers only to retention of the lien securing the allowed *secured* claim, rather than the creditor's total claim, suggests that the plan need not provide for the retention of that portion of the lien which relates to the creditor's post-bifurcation *unsecured* claim. Stated differently, § 1325(a)(5)(B) makes clear that a creditor's lien is protected only to the extent that it has value as determined under § 506(a). Conversely, that portion of the lien which is underwater is not protected; i.e., it is subject to invalidation or "stripdown" pursuant to § 506(d).

Notwithstanding § 1325(a)(5)(B), at least one court has opined that consummation of a chapter 13 plan simply entitles the debtor to discharge of the *in personam* liability corresponding to the underwater portion of an undersecured lien, with the lien itself surviving reorganization intact. *See Dyer,* 142 B.R. at 369–70. This argument, however, is contradicted by the Code's legislative history and the overall scheme of chapter 13.

The legislative history relating to § 1325(a)(5)(B) directly supports the conclusion that § 506(d) voids the underwater portion of the creditor's lien:

Unless the secured creditor accepts the plan, the plan must provide that the secured creditor retain the lien securing the creditor's allowed secured claim in addition to receiving value, as of the effective date of the plan of property to be distributed under the plan on account of the claim not less than the allowed amount of the claim. *To this extent, a secured creditor in a case under chapter 13 is treated identically with a recourse creditor under section 1111(b)(1)* of the House amendment.... Of course, *the secured creditors' lien only secures the value of the collateral and to the extent property is distributed of a present value equal to the allowed amount of the creditor's secured claim[,] the creditor's lien will have been satisfied in full.* Thus the lien created under section 1325(a)(5)(B)(i) is effective only to secure deferred payments to the extent of the amount of the allowed secured claim. *To the extent the deferred payments exceed the value of the allowed amount of the secured claim* and the debtor subsequently defaults, *the lien will not secure unaccrued interest represented in such deferred payments.*

124 Cong.Rec. S17423 (daily ed. Oct. 6, 1978), *reprinted in* App. 3 *Collier on Bankruptcy* X–48 (emphasis added).

Further support is found in the excerpt from the House Report quoted *infra* p. 185–86, which indicates that an objective of chapter 13 was to remedy "[c]urrent chapter XIII['s failure to adequately] recognize the differences between the true value of [consumer goods serving as collateral] and their value as leverage." In other words, an express purpose of chapter 13 was to prevent secured creditors from using their liens as "leverage" for extracting more from the debtor in the form of payments than the economic value of the lien.

Obviously, that objective would be defeated if a lien continues to secure payment of the post-bifurcation, "unsecured" portion of a chapter 13 creditor's total claim. Debtors would be put to the choice of either paying the secured creditor's total claim or losing the property serving as collateral. Thus for all practical purposes, undersecured creditors would continue to exercise the same kind of clout over chapter 13 debtors that Congress apparently viewed as excessive, and sought to limit, when it enacted the Code.

The contention that the underwater portion of a lien is unaffected by a chapter 13 reorganization is also undermined by the fact that the legislative history gives no indication that that is the case. A basic premise of the Code—that secured creditors are to be regarded as such only to

the extent that their liens are supported by the collateral's value—is laid out in fairly detailed terms in numerous reports discussing the proposed treatment of creditors holding a security interest in the debtor's property. *See, e.g., Report of the Commission on the Bankruptcy Laws of the United States,* H.R.Doc. No. 137, 93d Cong., 1st Sess., Pt. I at 165–66 (1973); H.R.Rep. No. 595 at 180–81; S.Rep. No. 989 at 68. In none of these discussions is there even a hint that such a creditor would lose only the *in personam* rights relating to the unsecured portion of its total claim. Nor did Congress intimate that underwater liens survive bifurcation and cramdown when it enacted § 1225(a)(5)(B), which is nearly identical to § 1325(a)(5)(B). It is inherently implausible that Congress intended to preserve underwater liens and yet, notwithstanding the rather obvious implications of §§ 506, 1225(a)(5)(B), and 1325(a)(5)(B), make no mention whatsoever of that intention in the legislative history corresponding to those provisions.

Consideration of chapter XIII Rule 13–1307(d) lends further support for the conclusion that § 506(d) invalidates underwater liens in chapter 13. That rule stated in pertinent part as follows:

> If a secured creditor files a claim, the value of the security interest held by him as collateral for his claim shall be determined by the court. The claim shall be allowed as a secured claim to the extent of the value so determined and as an unsecured claim to the extent it is enforceable for any excess of the claim over such value.

Pursuant to this rule, which was derived from § 646(1) of the Act, 11 U.S.C. § 1046(1) (repealed 1978), chapter XIII debtors could bifurcate undersecured claims, and discharge the unsecured portion of the indebtedness by providing for the unsecured claims in the plan of reorganization. *See* Countryman, *Partially Se-*

*cured Creditors Under Chapter XIII,* 50 Am.Bankr.L.J. 269, 276–80 (1976).[26] And it is clear that § 506(a), the Code's analogue to Rule 13–307(d),[27] allows the debtor to do at least that much: i.e., discharge the *in personam* liability of a post-bifurcation unsecured claim.

But so limiting the effect of § 506 in chapter 13 ignores the fact that subsection (d) of that statute has no pre-Code counterpart. Since § 506 is closely patterned after Rule 13–307(d), yet adds lien-avoidance language which was not contained in the rule, the logical inference is that § 506(d)'s apparent departure from chapter XIII practice was fully intended by the Code's drafters.

 Thus the legislative history and other considerations discussed above demonstrate that, with exceptions not relevant here, chapter 13 was designed to permit debtors who comply with their obligations under a confirmed plan to retain their property free and clear of liens securing claims provided for under the terms of the plan. The extension of *Dewsnup* to chapter 13 would thwart that clearly stated Congressional objective, not only insofar as it relates to residential mortgages, but with respect to all other forms of collateral as well. *See In re Windham,* 136 B.R. 878, 883 (Bankr.M.D.Fla.1992). Because such a result is contrary to legislative intent and ignores *Dewsnup*'s warnings to the effect that its holding was limited to chapter 7, I decline to follow those courts which have mechanically applied *Dewsnup* in reorganization cases.

Instead I hold that in chapter 13 cases the reference in § 506(d) to "allowed secured claim" carries the meaning supplied by § 506(a). Accordingly, the mortgages held by NBD and Foley may be invalidated pursuant to § 506(d) to the extent that they do not secure their respective allowed secured claims as determined under § 506(a). *See In re Butler,* 139 B.R. 258, 259 (Bankr.

---

**26.** This rule, effective October 1, 1973, was held invalid by some courts on the ground that it established a substantive right rather than a procedural mechanism. *Id.* at 274–77.

**27.** *See* 5 *Collier on Bankruptcy,* ¶ 1325.06[1] n. 40 and accompanying text (15th ed. 1993).

E.D.Okla.1992).[28]

### (iii) *Section 1325(a)(5)(B)*

■ As discussed in the preceding section, the text of § 1325(a)(5)(B) and its legislative history provide the evidence that *Dewsnup* found lacking in chapter 7—namely, that Congress fully intended to permit chapter 13 debtors to invalidate underwater liens. For the reasons which follow, I believe that this intention is so readily apparent from a fair construction of §§ 1325(a)(5)(B) and 506(a) that courts need not rely on § 506(d) in effectuating it: the authority to invalidate underwater liens inheres in § 1325(a)(5)(B).

■ The clear import of § 1325(a)(5)(B) is that the amount of a creditor's allowed secured claim, as determined under § 506(a), represents the value assigned by the Code to a lienholder's *in rem* rights against the property serving as collateral. To the extent that that creditor's total claim against the debtor exceeds this assigned value, the creditor is recognized as having an allowed unsecured claim. And this post-bifurcation unsecured claim is just that—an *unsecured* claim which, like all other such claims, confers on its holder no special rights vis-a-vis specific property of the debtor or the estate. *See Goins v. Diamond Mtg. Corp.*, 119 B.R. 156, 162 (Bankr.N.D.Ill.1990) ("The Bankruptcy Code consistently treats ... an undersecured creditor as the holder of two entirely separate claims, one secured, one unsecured.... To treat the two claims as one fully secured claim for plan and distribution purposes would discriminate unfairly against the other unsecured creditors...."); *In re Sakowitz, Inc.*, 110 B.R. 268, 269 (Bankr.S.D.Tex.1989) ("[T]here is no difference between the unsecured portion of an undersecured claim on the one hand and an unsecured claim from a creditor who had no security. Both are unsecured claims as provided in Section

506(a)."); M. Howard, *Dewsnupping the Bankruptcy Code*, J.Bankr.L. & P. 513, 528–29 (July/Aug. 1992) ("[E]very single provision affecting the rights of secured creditors in bankruptcy ... is consistent with the proposition that bankruptcy protects only the value of the postbifurcation secured claim and nothing more.").

■ In light of these fundamental principles, it becomes obvious that a creditor whose allowed secured claim has been fully paid pursuant to the terms of confirmed chapter 13 plan, having received what the Code deems to be the economic equivalent of its *in rem* rights, no longer enjoys those rights: the creditor's security interest has simply been "cashed out." *See In re Driver*, 133 B.R. 476, 479, 25 C.B.C. 1511 (Bankr.S.D.Ind.1991); *In re Hayes*, 111 B.R. 924, 926, 20 B.C.D. 491, 22 C.B.C.2d 1484 (Bankr.D.Or.1990); *In re Hargis*, 103 B.R. 912, 914 (Bankr.E.D.Tenn.1989). Thus such a creditor is in no position to cite nonpayment of its total, pre-bifurcation claim as grounds for refusing to release its lien, because § 1325(a)(5)(B) recognizes the value of the creditor's lien rights only to the extent of its allowed secured claim.

The conclusion that § 1325(a)(5)(B) contemplates the invalidation of underwater liens is bolstered by a comparison of that statute with a substantively similar pre-Code cramdown provision. Pursuant to § 461(11) of the Act, one of the options available to a chapter XII debtor in proposing a real property arrangement which "affected" a class of nonaccepting creditors was to provide "adequate protection for the realization by them of the value of their debts against the property dealt with by the arrangement and affected by such debts ... (c) *by appraisal and payment in cash of the value of such debts.*" 11 U.S.C. § 861(11) (repealed 1978) (emphasis added).

**28.** A number of other cases have held that *Dewsnup* does not preclude the application of § 506(a) to claims protected by § 1322(b)(2). *See Lomas Mtg. USA v. Wiese (In re Wiese)*, 980 F.2d 1279, 1281 (9th Cir.1992); *Sapos*, 967 F.2d at 924–26; *Bellamy*, 962 F.2d at 180–185; *In re Cardinale*, 142 B.R. 42, 43 (Bankr.D.R.I.1992); *In re Govan*, 139 B.R. 1017, 1021–23 (Bankr. N.D.Ala.1992). But only *Butler* specifically stated that lien avoidance follows from bifurcation.

Like § 1325(a)(5)(B), then, § 461(11) in effect gave a chapter XII debtor the right to retain property serving as collateral notwithstanding the secured creditor's objection, so long as the creditor received payment in an amount equal to the value of its lien. And the natural inference arising from that right—namely, that the creditor's lien would be extinguished *in toto* upon receipt of such payment—was judicially recognized. *See Pine Gate*, 2 B.C.D. at 1491; *Accousti*, 2 B.C.D. at 1094.

Yet Congress did not repudiate this inference when § 1325(a)(5)(B) was enacted in 1978. Nor did Congress rebuke those courts which continued to assume that underwater liens are eliminated in a cramdown, *see, e.g., In re Perimeter Park Inv. Assocs.*, 697 F.2d 945, 952–53 (11th Cir. 1983) (§ 461(11)); *In re Allred*, 45 B.R. 676, 678, 11 C.B.C.2d 1343 (Bankr.E.D.N.C. 1985) (§ 1325(a)(5)(B)); *In re Rainbow Tower Assocs.*, 5 B.C.D. 493, 498 (Bankr. D.Kan.1979) (§ 461(11)), when it had a golden opportunity to do so in 1986, with the creation of chapter 12 and a cramdown provision—§ 1225(a)(5)(B)—that is virtually identical to § 1325(a)(5)(B). Thus it is particularly appropriate that lien avoidance be viewed as part and parcel of the cramdown process. *See In re Kilen*, 129 B.R. 538, 546, 21 B.C.D. 1434, 25 C.B.C.2d 326 (Bankr.N.D.Ill.1991) ("It is logical to assume that Congress was aware of judicial interpretations of § 2(a)(2A) of the 1898 Bankruptcy Act when it formulated § 505 and chose not to overrule those decisions."); *cf. Lorillard v. Pons*, 434 U.S. 575, 580, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978) ("Congress is presumed to be aware of a[ ] ... judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change....").[29]

With these considerations in mind, it can be seen that § 506(d) simply makes explicit that which is implicit under §§ 506(a) and 1325(a)(5)(B): a creditor's lien secures payment only of that creditor's allowed *secured* claim, not the total, pre-bifurcation claim. I therefore believe that § 1325(a)(5)(B), read in conjunction with § 506(a), provides ample justification for the conclusion that chapter 13 debtors can invalidate underwater liens. *Cf.* K. Lundin, *Chapter 13 Bankruptcy* § 9.24 (1990) ("Logic dictates that once a [chapter 13] secured claim is paid in full, the lien must be released.... At discharge after full payment of secured claims, it makes sense that liens are released; there is just no specific provision of the Code to point to for this result.").

Accordingly, I hold in the alternative that the Debtors may compel Foley and NBD to release their respective mortgages pursuant to the implicit authority to do so provided by §§ 506(a) and 1325(a)(5)(B), even if *Dewsnup* precludes the utilization of § 506(d) for that purpose.

### C. *When Does Lien Avoidance Occur?*

■ The next question is whether the Debtors may immediately invalidate the liens of NBD and Foley. The text of § 506(d) implies that the underwater portion of a creditor's lien becomes void upon bifurcation. But that provision must be interpreted with reference to § 551, which provides that "any lien void under section 506(d) ... is preserved for the benefit of the estate[,] but only with respect to property of the estate."[30] Since a lien cannot simultaneously be rendered "void" (meaning that it "has no legal or binding

---

**29.** The conclusion that Congress implicitly accepted as correct the understanding of those courts which construed § 461(11) as permitting lien stripping is bolstered by the fact that references to *Pine Gate* are found in the Code's legislative history, *see* S.Rep. No. 989, 95th Cong., 2d Sess. 65 (1978); 124 Cong.Rec. S14719 (daily ed. Sept. 7, 1978) *reprinted in* App. 3 *Collier on Bankruptcy* VIII–5, while both *Pine Gate* and *Accousti* were among the cases reviewed in an article which received Congres-

sional attention during deliberation over the 1986 amendments, *see supra* note 25 and accompanying text.

**30.** This provision is designed to "prevent[ ] junior lienors from improving their position at the expense of the estate when a senior lien is avoided." H.R.Rep. No. 595, 95th Cong., 1st Sess. 376 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 91 (1978).

force" [31]) and yet "preserved," the only logical inference is that the lien retains its validity at least until such time as the collateral ceases to be property of the estate.

▮ Unless there is a contrary provision in the chapter 13 plan or the order confirming it, property ceases to be property of the estate upon confirmation of a chapter 13 plan. *See* 11 U.S.C. § 1327(b); *In re Root*, 61 B.R. 984, 985 (Bankr.D.Colo. 1986) (" 'Any property which has not been designated in the plan or order of confirmation as necessary for the execution of the plan revests in the debtor ...' and is thus no longer 'property of the estate.' " (quoting *In re Adams*, 12 B.R. 540, 542, 8 B.C.D. 78, 4 C.B.C.2d 1054 (Bankr.D.Utah 1981))). Upon plan confirmation, then, a debtor may be able to obtain an order which explicitly declares void an underwater lien without running afoul of § 551.[32] For the reasons which follow, however, the better course for courts to take generally is to preclude debtors from exercising that option by specifying in the order confirming the plan that any property encumbered by liens securing an allowed secured claim shall remain property of the estate until the plan is consummated.[33]

▮ Section 349(b)(1)(C) states that, "[u]nless the court, for cause, orders otherwise, a dismissal of a case ... (1) reinstates ... (C) any lien voided under section 506(d) of this title." Since a lien is an *in rem* right, *see* § 101(37), a "reinstated" lien would, like all liens, attach to the property serving as collateral. If a debtor could invalidate a lien pursuant to § 506(d) prior to plan consummation, she could turn around and sell the property to an unsuspecting third party, on the (technically correct) representation that the property is unencumbered. If the debtor then obtains (or suffers) a dismissal of her case prior to fulfilling her obligations under the plan, the "sanction" under § 349(b)(1)(C) will be visited on the purchaser of the property in question, not the debtor. And while the court could avoid any injustice to third parties by ordering that the lien not be reinstated, that would simply mean that the (former) lienholder, rather than the third party, would pay the price for the debtor's sleight of hand.

Moreover, there is no provision for reinstatement of liens voided under § 506(d) in the event of conversion. *See* 11 U.S.C. § 348. And as pointed out in *In re Kinder*, 139 B.R. 743, 744–45, 22 B.C.D. 1497, 26 C.B.C.2d 1654 (Bankr.W.D.Okla.1992), that fact could permit a debtor whose case is converted to chapter 7 to circumvent *Dewsnup* 's holding that a chapter 7 debtor cannot utilize § 506(d) to invalidate underwater liens.

Although postponing lien avoidance under § 506(d) until the plan is consummated would seem to make § 349(b)(1)(C) pointless, it actually gives that provision fuller effect than would otherwise be the case. The general idea behind § 349 is that the dismissal of a bankruptcy case should reestablish the rights of the parties as they existed when the petition was filed. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 338 (1977) ("The basic purpose of the subsection is to undo the bankruptcy case, as far as practicable, and to restore all property rights to the position in which they were found at the commencement of the case.").

For the reasons mentioned, however, attainment of that objective could be substantially hindered or rendered impossible if the

---

**31.** *Black's Law Dictionary* (5th ed. 1979).

**32.** Depending again on the terms of the plan or the confirmation order, the debtor also might be able to invalidate liens pursuant to § 1327(c), which states that "property vesting in the debtor ... is free and clear of any claim or interest of any creditor provided for by the plan." *See* K. Lundin, *Chapter 13 Bankruptcy* §§ 6.10–.12 (1990) (discussing cases pro and con on the question of whether § 1327(c) can invalidate liens).

**33.** The debtor may already have included a provision in the plan serving that objective, for fear that "[t]he vesting of property of the estate in the debtor at confirmation under § 1327(b) may have the effect of dissolving the automatic stay of actions against the property vesting in the debtor." Lundin, *supra* note 32, at § 6.13; *see also In re Root*, 61 B.R. 984, 985 (Bankr.D.Colo. 1986).

debtor is permitted to invalidate liens under § 506(d) prior to performing the duties specified in the plan. Indeed, the very fact that § 349(b)(1)(C)'s objective is easily thwarted if liens are declared void under § 506(d) at the time of bifurcation suggests that § 506(d) should not be so applied. *See In re Rose*, 86 B.R. 86, 89–90 (Bankr. E.D.Mich.1988) (Congress presumably does not intend its legislation to be interpreted in a manner that would permit parties to easily defeat its objective). By delaying the ultimate effect of § 506(d) in the manner discussed, the court increases the likelihood that restoration of the *status quo ante* will be possible.

More fundamentally, this approach preserves the integrity of the court. If lien avoidance were not delayed until consummation of the plan, the court could be obliged to issue an order which declares to the world that the lien in question is void, when in fact the lien's validity is only potentially affected by the valuation proceeding/plan confirmation. The most likely purpose such a premature and misleading order would serve is to permit an unscrupulous debtor to sell the collateral or further encumber it prior to dismissal of the bankruptcy case. *See Leverett*, 145 B.R. at 714 (lien avoidance prior to completion of the chapter 12 plan "would invite mischief" and "would serve no purpose whatever"). If the lien is not invalidated until it is no longer subject to reinstatement, on the other hand, the order voiding the lien will accurately reflect its true status.

The concern that a debtor might shirk her responsibilities under a confirmed chapter 13 plan if she obtains a lien release prior to consummation of the plan was recently characterized by a bankruptcy court as "more illusory than real." *Murry–Hudson*, 147 B.R. at 962. In that case, the debtor sought an order requiring Ford Motor Credit Co. to release its lien on her automobile. At the time the motion was filed, Ford's allowed secured claim had been fully paid pursuant to the debtor's confirmed chapter 13 plan, but the plan would not be completed for more than a year and Ford's post-bifurcation unsecured claim had not yet been paid according to the plan's terms. Ford opposed the debtor's motion, citing the possibility that the case could subsequently be dismissed or converted.

The court granted the debtor's motion on the ground that release of the lien was mandated by a provision in the plan stating that "[s]ecured creditors shall retain their liens until their allowed secured claims have been paid." *Id.* at 961. In *dictum*, however, the court offered numerous reasons why it believed Ford's concerns were overstated, the principal ones being as follows: (1) "[t]he plan confirmation process itself provides some protection against abuse," *id.* at 962; (2) various considerations make it unlikely that a debtor would opt to convert to chapter 7 as a means of avoiding her obligations under a confirmed chapter 13 plan; and (3) a creditor whose allowed secured claim has been paid in full will in any event be no worse off as a result of the debtor's failure to consummate a chapter 13 plan than it would be if it had repossessed the collateral and sold it in the first instance.

In support of the first of these arguments, *Murry–Hudson* noted that "[i]n order to have her plan confirmed, the debtor has the burden of establishing among other things that the plan is proposed in good faith (§ 1325(a)(3)), is in the best interests of creditors (§ 1325(a)(4)), and is feasible (§ 1325(a)(6)). If the trustee or an unsecured creditor objects, she must also meet the 'disposable income' test of § 1325(b)." *Id.*

Unfortunately, however, none of these criteria provide a reliable mechanism for predicting what a debtor will do at some future date after the proposed plan is confirmed. Even if the debtor has no intention of fulfilling her obligations under the proposed plan, there would ordinarily be no objective manifestation of that intent which would provide a grounds for denying confirmation. I therefore do not believe that these safeguards substantially protect creditors in the way that *Murry–Hudson* suggests.

Speaking to the second argument, *Murry–Hudson* made these observations regarding a chapter 13 debtor's incentive for converting to chapter 7 after obtaining release of an underwater lien:

> [I]t seems unlikely that a crafty but unscrupulous debtor would opt for the conversion route. In doing so, he would deprive himself of the super discharge he would be entitled to receive under § 1328 at a time when the plan would be well on its way or even nearing completion. By the same token, he would be at risk of having costly and potentially ruinous lawsuits brought against him under § 523(a) and § 727(a), perhaps by the very secured creditors whose liens were stripped down in the Chapter 13 case. *See* §§ 348(d); 727(a)(2).
>
> The debtor also runs the risk of having his conversion scheme foiled entirely. While § 1307(a) gives a debtor the unbridled right to convert to Chapter 7, it does not give him the unbridled right to remain there. If he has the ability to complete his Chapter 13 plan, or the Court otherwise finds that the granting of Chapter 7 relief would be a substantial abuse of the provisions of that chapter, his case could be dismissed pursuant to § 707(b).

*Id.* at 964.

As with *Murry–Hudson*'s confidence in the "confirmation process," I believe the court's optimism regarding the efficacy of the Code in discouraging such bad faith conversions is overstated. For one thing, the advantages of the broader chapter 13 discharge are probably irrelevant to most debtors. Secondly, unlike the situation in *Murry–Hudson*, bifurcation frequently results in a very small allowed secured claim, or (as with NBD's claim) no secured claim at all, meaning that the debtor could convert her case shortly after obtaining plan confirmation.

With regard to the remedies cited by *Murry–Hudson* in the event of a bad-faith conversion, I acknowledge that these options exist and may prove effective in some instances. But invoking these remedies involves time, energy and money, both on the part of the court and the affected creditor(s). And in the run-of-the-mill case, the benefits gained in exchange for taking on the increased risk that such remedies will prove necessary are minimal or nonexistent. Indeed, neither here or in *Murry–Hudson* was any reason cited why lien invalidation could not wait until the plan is consummated.

■ The court's argument in *Murry–Hudson* that Ford could in any case not expect to receive more than its allowed secured claim in liquidating its lien is also unpersuasive. In the context of chapter 13, a fundamental principle underlying § 349(b)(1)(C) is that a debtor who fails to abide by the terms of her plan will generally lose the remarkable benefit offered to her by § 506(d)—namely, the ability to strike down underwater liens. Correlatively, a chapter 13 creditor whose lien has been subjected to § 506(d) has the consolation of knowing that it will probably be able to enforce its *in rem* rights, despite the bifurcation of its claim, should the debtor fail to live up to her contractual obligations under the plan. It is this entirely legitimate expectation on the creditor's part—rather than what such a creditor could have expected to yield from a sale of its collateral had the debtor never filed bankruptcy—that the court should protect. And the approach taken by *Murry–Hudson* unnecessarily diminishes the likelihood that § 349(b)(1)(C) will be availing to such creditors, while at the same time diluting one of the important incentives designed to ensure that chapter 13 debtors stay the course.[34]

■ For these reasons, I hold that the Debtors cannot invalidate the liens of NBD and Foley pursuant to § 506(d) until they have completed their confirmed plan. *See Leverett*, 145 B.R. at 713–14; *In re Vieselmeyer*, No. 90–03486, 1991 Bankr. LEXIS 1401 at *2–3 (Bankr.D.Idaho Sept. 5, 1991); *cf. Castle v. Parrish*, 29 B.R. 869,

---

**34.** Another problem with the result in *Murry–Hudson* is that it would make it relatively easy for debtors to do an end-run around the Supreme Court's holding in *Dewsnup* by filing chapter 13, obtaining a release of the underwater lien, and promptly converting to chapter 7.

874, 9 C.B.C.2d 232 (Bankr.S.D.Ohio 1983) ("[T]he right to avoid a lien [pursuant to § 522(f)] has not fully matured in a Chapter 13 context until a discharge is granted upon successful completion of the Chapter 13 Plan."). Accordingly, the order confirming the Debtors' plan will specifically provide that the Debtors' house shall remain property of the estate, and shall *not* revest in the Debtors, until the Debtors are granted a discharge.[35]

## II. SHOULD HYPOTHETICAL COSTS OF SALE BE DEDUCTED FROM THE CREDITOR'S SECURED CLAIM?

In making the valuation required under § 506(a), there are two factors which are clearly relevant. First, the value of the collateral must be determined. Because the reference in § 506(a) to "the extent of the value of such creditor's interest in the estate's interest in such property" provides for the situation "where the estate's interest is less than full ownership," *In re Courtright*, 57 B.R. 495, 497 (Bankr.D.Or.1986), that value must then be adjusted if necessary to reflect the extent of the estate's ownership.[36]

35. My discussion regarding the timing of lien avoidance focused on § 506(d) as the source of the Debtors' authority to invalidate the liens at issue, rather than § 1325(a)(5)(B). Even under this latter theory, however, I would likewise conclude that lien avoidance should await plan consummation, as the policy considerations are essentially the same in either case.

36. *Courtright*'s interpretation of § 506(a) has been questioned. *See* J. Queenan, Jr., *Standards for Valuation of Security Interest in Chapter 11*, 92 Comm.L.J. 18, 35 (1987) ("Obviously the creditor cannot have a greater interest in the property than the debtor. If the statute referred only to the creditor's interest in the property, the meaning would be the same where the debtor owns less than a fee."). But Judge Queenan's assertion that a creditor cannot have an interest in collateral greater than that of the debtor's is incorrect. Assume, for example, that the debtor and three other parties each own a quarter interest in Blackacre. If a creditor holds a mortgage on Blackacre securing a debt owed jointly and severally by all four owners, then that creditor's interest attaches to the entire fee, not just the debtor's quarter interest. Thus the

Second, all courts seem to agree that the value of a lien is reduced to the extent that there are liens on the collateral which are senior to the lien in question. *See, e.g., In re Dinsmore*, 141 B.R. 499, 510, 27 C.B.C.2d 785 (Bankr.W.D.Mich.1992); *In re 222 Liberty Assocs.*, 105 B.R. 798, 803–04 (Bankr.E.D.Pa.1989) (collecting cases). Since a "bankruptcy estate's interest in any asset is ... subject to existing valid liens," *In re Richardson*, 82 B.R. 872, 873 (Bankr. S.D.Ohio 1987), the deduction of such senior interests, like the adjustment based on the debtor's ownership interest in the property, is an application of § 506(a)'s requirement that the court focus on the value of the "creditor's interest *in the estate's interest* in [the] property." (emphasis added). Thus if a creditor has a lien on property owned solely by the debtor which secures a $100,000 debt, and the property is worth $120,000 but is encumbered by senior liens totaling $80,000, the value of that creditor's lien is no more than $40,000 ($120,000 less $80,000).

The question here, and one which has been much debated, is whether it is appropriate to further discount the value of a lien to reflect the hypothetical cost of disposing of the collateral.[37] For the reasons which follow, I hold that it is not.

limitation in the statute to "the estate's interest" insures that the creditor's secured claim is not valued in an amount greater than the value of the debtor's (and therefore the estate's) interest in the property.

Judge Queenan is apparently troubled by *Courtright* because he believes that it undermines his own interpretation of that portion of the statute—namely, that it calls for a valuation of the creditor's interest in the collateral, rather than a valuation of the collateral itself. *Id.* at 36. But I see no reason why the statutory language cannot serve the purposes which both *Courtright* and Judge Queenan ascribe to it.

37. *Compare, e.g., In re Mountain Side Holdings*, 142 B.R. 421, 423, 23 B.C.D. 282 (D.Colo.1992); *In re Coby*, 126 B.R. 593, 596 (D.Nev.1991); *In re Figueroa Ruiz*, 121 B.R. 419, 422 (D.P.R.1990); *In re Weber*, 140 B.R. 707 (Bankr.S.D.Ohio 1992); *In re Robbins*, 119 B.R. 1, 4, 20 B.C.D. 1688 (Bankr.D.Mass.1990); *In re Boring*, 91 B.R. 791, 795 (Bankr.S.D.Ohio 1988); *In re Richardson*, 82 B.R. 872, 873 (Bankr.S.D.Ohio 1987); *In re Claeys*, 81 B.R. 985, 992 (Bankr.D.N.D.1987); *In re Parr*, 30 B.R. 276, 277–78 (Bankr.N.D.Ala.

In concluding that the deduction of hypothetical sale costs is inappropriate where no sale is in prospect, some courts have relied on the second sentence of § 506(a), which states that the "value shall be determined in light of ... the proposed disposition or use of" the collateral. *See, e.g., Wiese,* 980 F.2d at 1285–86; *In re Coker,* 973 F.2d 258, 260 (4th Cir.1992); *Brown & Co. v. Balbus (In re Balbus ),* 933 F.2d 246 (4th Cir.1991); *In re Case,* 115 B.R. 666, 669–670 (9th Cir.B.A.P.1990); *Dinsmore,* 141 B.R. at 509–10; *In re Robertson,* 135 B.R. 350, 352 (Bankr.E.D.Ark.1992); *In re Landing Assocs.,* 122 B.R. 288, 294, 21 B.C.D. 297 (Bankr.W.D.Tex.1990); *In re Usry,* 106 B.R. 759, 760–61, 22 C.B.C. 190 (Bankr. M.D.Ga.1989); *222 Liberty Assocs.,* 105 B.R. at 804; *In re Courtright,* 57 B.R. at 497. If the debtor intends to retain the collateral, these courts reason, there is no "proposed disposition," and therefore sale costs are irrelevant.

 In justifying this result, many of the cases cited suggested that any other interpretation of § 506(a) would render its second sentence pointless. *See, e.g., Wiese,* 980 F.2d at 1286; *Coker,* 973 F.2d at 260; *Balbus,* 933 F.2d at 251; *Usry,* 106 B.R. at 761; *Courtright,* 57 B.R. at 497. But regardless of whether the second sentence speaks to the relevancy of hypothetical sale costs, it is clear that, at a minimum, that portion of § 506(a) directs the court to vary the valuation standard—e.g., going concern value, liquidation value—to fit the particular circumstances.[38] Contrary to the foregoing authorities, then, the statute need

not be interpreted in the manner they suggest in order to vindicate the second sentence.

· Moreover, interpreting the second sentence of § 506(a) as relating only to the proper valuation standard appears to be consistent with legislative intent. *See infra* pp. 186–87. And since the valuation standard used has no bearing on the question of whether sale costs should (or should not) be deducted,[39] I do not believe that the second sentence in § 506(a) mandates that the courts disregard hypothetical sale costs in this context.

On the other hand, those courts that do deduct hypothetical sale costs have read too much into the first sentence of § 506(a), which calls for the court to value the "creditor's interest in the estate's interest" in the collateral. Citing this first sentence, these courts emphasize that the ultimate objective of § 506(a) is to put a value on the secured creditor's lien, rather than the collateral to which it relates. *See, e.g., Weber* 140 B.R. 707, 710–11 (Bankr. S.D.Ohio 1992); *In re Smith,* 92 B.R. 287, 290–91 (Bankr.S.D.Ohio 1988); *In re Claeys,* 81 B.R. 985, 990–92 (Bankr.D.N.D. 1987); *In re Paige,* 13 B.R. 713, 714 (Bankr.S.D.Ohio 1981). The courts' reasoning proceeds as follows: a lien has value only to the extent that it can be converted into cash. Since that is accomplished by foreclosing the lien and selling the collateral, and since such a sale typically involves costs that will be paid out of the sale proceeds, adjusting the value of a lien to

1983); *In re Ward,* 13 B.R. 710 (Bankr.S.D.Ohio 1981) (hypothetical sale costs considered); *with, e.g., Wiese,* 980 F.2d at 1285–86; *Brown & Co. v. Balbus (In re Balbus),* 933 F.2d 246 (4th Cir. 1991); *In re Case,* 115 B.R. 666, 670 (9th Cir. B.A.P.1990); *Dinsmore,* 141 B.R. 499, 510, 27 C.B.C.2d 785; *In re Landing Assocs.,* 122 B.R. 288, 294 (Bankr.W.D.Tex.1990); *Bellamy,* 122 B.R. at 862–63; *Cobb,* 122 B.R. at 26; *In re Spacek,* 112 B.R. 162, 164 (Bankr.W.D.Tex. 1990); *In re Usry,* 106 B.R. 759, 761, 22 C.B.C. 190 (Bankr.M.D.Ga.1989); *In re 222 Liberty Assocs.,* 105 B.R. 798, 804 (Bankr.E.D.Pa.1989); *In re Bellman Farms,* 86 B.R. 1016, 1019 (Bankr. D.S.D.1988); *In re Courtright,* 57 B.R. 495, 497 (Bankr.D.Or.1986) (amount of a creditor's al-

lowed secured claim not adjusted for such costs).

**38.** *See, e.g., In re Frost,* 47 B.R. 961, 964, 12 C.B.C.2d 990 (D.Kan.1985); *In re Johnson,* 145 B.R. 108, 115 (Bankr.S.D.Ga.1992).

**39.** *See Mountain Side Holdings,* 142 B.R. at 423 ("Whether value is determined on a 'forced sale' or 'best use' [i.e., 'going concern'] basis, there is still a hypothetical sale."); *Weber,* 140 B.R. at 711 ("If the ... creditor is forced to look to its collateral for satisfaction, there is a slippage between the value of the property, *on whatever appropriate market or standard is chosen,* and the amount the creditor will receive." (emphasis added)).

reflect hypothetical sale costs is as sound as deducting senior encumbrances from the lien's value. *See Dinsmore*, 141 B.R. at 509 (explaining the viewpoint of those courts which deduct sale costs).

▇▇▇▇▇ I agree with the premise of these courts, which is that the focus in § 506(a) is the value of the lien in question. But there are two flaws in their reasoning. The first is the assumption that liens must be valued based solely on what the secured creditor would reap at a foreclosure sale. Although the Code's legislative history does analogize the § 506(a) valuation process to a kind of simulated foreclosure, *see infra* p. 186, I do not believe that passing references of this kind warrant the conclusion that a foreclosure *must* be posited by the court when valuing a lien.

To the contrary, foreclosure is only one way to realize the value of a lien. Other methods include allowing the debtor to discharge the lien over a period of time by making installment payments, awaiting a sale of the collateral by the debtor, or obtaining a deed in lieu of foreclosure. None of these options would require the creditor to "eat" the cost of a forced sale. Thus the deduction of hypothetical sale costs, which ironically is premised on what would happen in the "real world," ignores the very real possibility that a foreclosure sale could prove unnecessary, and instead assumes a worst-case scenario from the creditor's perspective.

One could argue in response to this criticism that sale costs should still be factored in, because a knowledgeable debtor would not agree to pay more, as a price for the creditor's forbearance, than the creditor could expect to receive at a foreclosure sale. But that is not necessarily true, as the following example will illustrate.

Assume the debtor owes a creditor $100,-000, and that the debt is secured by a mortgage on the debtor's home, which has a fair market value of $80,000. Assume also that the creditor would incur costs of $10,000 in foreclosing its mortgage and selling the home.

Those courts which adjust value under § 506(a) based on hypothetical sales costs would conclude that the creditor in this example holds an allowed secured claim of $70,000. But there is a distinct possibility that the creditor could hold out for more than $70,000 in exchange for its forbearance. After all, it is not likely that the debtor would be able to find another home comparable to her present one for much less than $80,000. And if the debtor were forced to relocate, she probably would incur transaction costs of her own, such as those relating to an inspection of the new home, hiring a mover, and/or obtaining new financing. Mindful of these various costs, the debtor in this scenario may very well conclude that $80,000 is a reasonable price to pay to keep her home. Thus the hypothetical demonstrates that liens will often be undervalued if the court disregards the possibility that the creditor could use the debtor's own transaction costs as leverage in any negotiations between the parties.

The hypothetical could be criticized on the ground that Congress did not want courts to factor in the debtor's transactions costs. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 127 (1977) ("This right [of redemption under § 722] ... allows the debtor to retain his necessary property and avoid high replacement costs...").[40] In discussing chapter 13, the same House Report makes the following comments:

> Most often in a consumer case, a secured creditor has a security interest in property that is virtually worthless to anyone but the debtor. The creditor obtains a security interest in all of the debtor's furniture, clothes, cooking utensils, and other personal effects. These items have little or no resale value. They do, however, have a high replacement cost. The mere threat of repossession operates as

**40.** Although these comments pertain specifically to § 722, rather than § 506, their import should not be limited to the redemption context. A debtor exercises her right to redeem certain property from a lien "by paying the holder of such lien the amount of the allowed secured claim." 11 U.S.C. § 722. And the amount of a creditor's "allowed secured claim" is determined by § 506(a).

pressure on the debtor to pay the secured creditor more than he would receive were he actually to repossess and sell the goods.

Current chapter XIII does little to recognize the differences between the true value of the goods and their value as leverage. Proposed chapter 13 instead views the secured creditor debtor relationship as a financial relationship, and not one where extraneous, non-financial pressures should enter. The bill requires the court to value the secured creditor's interest.... To the extent that his claim against the debtor exceeds the value of his collateral, he is treated as having an unsecured claim....

*Id.* at 124. *See In re Cook,* 38 B.R. 870, 873 (Bankr.D.Utah 1984) (citing the House Report in support of its conclusion that "[r]eplacement cost is not an appropriate standard" in valuing collateral for purposes of § 1325(a)(5)(B)(ii)).

However, this apparent restriction with respect to the debtor's replacement costs lends support for the conclusion that hypothetical sale costs should likewise not be considered when valuing a lien. If such costs were deducted, then the valuation process would be unfairly slanted against the secured creditor, as only the creditor's potential expenses would be factored into the equation, with liens being systematically undervalued as a result. It seems unlikely that Congress contemplated such a skewed analysis, and there is strong evidence to the contrary.

The contention that the value of collateral (less senior liens) is not dispositive for purposes of determining the value of a lien is contradicted by the statute's legislative history. The House report indicates that, pursuant to § 506(a), an undersecured creditor "has a secured claim to the extent of the *value of his collateral.*" H.R.Rep. No. 595, 95th Cong., 1st Sess. 356 (1977) (emphasis added). *See In re Beacon Hill Apartments,* 118 B.R. 148, 151 (N.D.Ga. 1990) ("[T]he focus of the legislative history [of § 506(a)] is on the value of the collateral without deduction for disposition costs."). The same report explains § 722, the redemption provision, by providing a hypothetical in which references to foreclosure costs are conspicuously absent. H.R.Rep. No. 595 at 381.[41] The report also describes the redemption right as "amount[ing] to a right of first refusal on a foreclosure sale of the property involved." *Id.* at 127. Since such a right would entail paying an amount equal to the value of the collateral—rather than an amount equal to the creditor's proceeds at the foreclosure net of all costs—the implication is that a creditor's allowed secured claim is determined without reference to hypothetical foreclosure-related costs.[42]

▮▮ With regard to the legislative history's focus on the value of collateral, one could minimize the significance of the lack

---

**41.** That portion of the legislative history states in pertinent part as follows: "Thus, for example, if a debtor owned a $2,000 car, subject to a $1,200 lien, the debtor could exempt his $800 interest in the car.... This section permits him to pay the holder of the lien $1,200 and redeem the entire car...."

**42.** A leading treatise cites the fact that the Bankruptcy Commission, in discussing its proposed redemption provision (which called for payment of the collateral's "fair market value," rather than the Code's requirement that the debtor redeem by paying the creditor the amount of its "allowed secured claim"), opined that "[t]he most appropriate standard [for determining a collateral's "fair market value"] is the *net amount* the creditor would receive were he to repossess the collateral and dispose of it as permitted by the applicable nonbankruptcy law." *Report of the Commission on the Bank-*

*ruptcy Laws of the United States,* H.R. Doc. No. 137, 93d Cong., 1st Sess. Pt. II at 131 (1973) (emphasis added). *See 4 Collier on Bankruptcy* ¶ 722.05[1] n. 3. But the Commission did not explain what it meant by "net": that term may have been used to refer to proceeds from a sale of the collateral net of senior liens and sale costs, or simply net of senior liens. Moreover, another section of the same report provides as follows: "Fair market value needs no definition; it is what a willing buyer would pay a seller who is able to hold on to the property until a reasonable offer is received." H.R. Doc. No. 137 Part I at p. 180 n. 41. Thus the Commission report is ambiguous and self-contradicting, and in any event is less useful than the House Report in determining the intent of Congress. *See Garcia v. United States,* 469 U.S. 70, 76, 105 S.Ct. 479, 483, 83 L.Ed.2d 472 (1984) ("[T]he authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill....").

of any reference to foreclosure costs by pointing out that the same legislative history also makes no mention of senior liens. But since the value of a creditor's lien is limited by the first sentence in § 506(a) to the estate's interest in the collateral, the text of § 506(a) itself warrants the conclusion that the court must take senior liens into account when valuing a lien thereunder. *See supra* pp. 183–84. Moreover, the assumption that senior liens would be deducted from a lien's value borders on the obvious: if they weren't, then multiple lienholders could each hold hundreds of thousands of dollars in secured claims on property worth only $100,000.

There is no such self-evident assumption with regard to foreclosure costs. If anything, the assumption would be to the contrary: just as a homeowner's equity is not commonly understood to be net of hypothetical sales costs, so too the value of an undersecured creditor's mortgage is generally assumed to be coextensive with the value of the mortgaged home. Thus the failure to mention foreclosure costs in the legislative history, unlike the failure to highlight the importance of senior liens, supports the inference that that consideration is not relevant to the § 506(a) inquiry.

Which brings me to the second, more fundamental flaw in the reasoning of those courts which deduct hypothetical sale costs. Even if it is appropriate to postulate a sale, § 506(a) does not direct the court to charge the costs of the sale to the creditor's secured claim. And for the reasons explained, the legislative history suggests that creditors should not be charged with such costs. Other considerations point to the same conclusion.

Though a creditor might have a contractual right to recover from a third party any deficiency resulting from the sale of its collateral, the majority view is that the amount of its allowed secured claim should not be adjusted accordingly. *See Wiese,* 980 F.2d at 1283; *Grubbs v. National Bank of South Carolina,* 114 B.R. 450, 452 (D.S.C.1990); *Cook,* 38 B.R. at 875; *In re Van Nort,* 9 B.R. 218, 221 (Bankr. E.D.Mich.1981).[43] In chapter 13, the rationale for this result is that § 1325(a)(5)(B) merely protects the creditor's "expectations of recovery *as against the debtor,"* not as against a third party. *Cook,* 38 B.R. at 876 (quoting Bowman & Thompson, *Secured Claims Under Section 1325(a)(5)(B): Collateral Valuation, Present Value, and Adequate Protection,* 15 Ind.L.Rev. 569, 576–77 (1982)); *see also Grubbs,* 114 B.R. at 452. This same rationale logically calls for the conclusion that hypothetical sale costs should also be disregarded: if the creditor cannot augment its secured claim by amounts it knows it would recover from third parties upon foreclosure, it makes little sense to debit its claim by amounts that the creditor would have to pay to third parties upon foreclosure. *See Wiese,* 980 F.2d at 1286 ("[I]t would be inconsistent not to calculate [the mortgagee's right of recourse against a private mortgage insurer] into the value but to allow hypothetical transaction costs.").

The conclusion that valuation under § 506(a) is made without reference to foreclosure costs also fosters uniformity and certainty. If such costs were a consideration, how would they be determined? What if the creditor argued that it would retain the repossessed collateral, rather than sell it? What about creditors who insist that they could dispose of the property without incurring sales costs at the pre-

---

**43.** The Debtors' reliance on *Van Nort* is misplaced. That case held that the value of a chapter 13 creditor's lien on the debtor's car should be determined based on the wholesale value of the car, rather than its retail value. 9 B.R. at 221. But the use of a wholesale valuation method is not incompatible with the premise that foreclosure costs are irrelevant. *See supra* pp. 184. In fact, *Van Nort* appears to have valued the creditor's lien based solely on the purchase price that the creditor could expect in the event of a foreclosure sale. *See* 9 B.R. at 221–22 (The wholesale value "can be established through appraisal, as it was in this case, or by reference to listings of automobile sources.... At that time [i.e., the date the debtors filed their petition,] the wholesale value of the Van Norts' Volare was approximately $2,000.00. That is the amount of Chrysler Credit's allowed secured claim...."). The court did not deduct hypothetical sale costs from that price.

vailing rate (for example, a creditor who knows a broker who could provide services at no charge)? *Cf. Weber*, 140 B.R. at 710 ("Only when the creditor is in the business of selling the type of collateral which secures its debt, can [it] ... argue that recourse to its collateral ... would result in actual costs of transfer or sale which would be less than approximately 10% of the collateral's value."). Since time is money, should a monetary figure be put on the time that the creditor would have to expend in foreclosing its lien? [44]

In short, basing the value of a lien on factors other than the collateral's value (and the amount of senior liens) opens up a Pandora's box of suppositions and speculations. Restricting the § 506(a) inquiry to the value of the collateral and the amount of liens encumbering the collateral, on the other hand, reduces the likelihood of litigation, and lowers the cost of litigating those disputes which do arise. *Cf. Briggs*, 143 B.R. at 451–52 (judicial policy of discouraging litigation may be an appropriate consideration when construing a statute).

This interpretation of § 506(a) is consistent with the rationale of the Sixth Circuit's decision in *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427 (6th Cir. 1982), where the court addressed a chapter 13 plan which provided for the cramdown of a car loan. In holding that courts should use the current market rate of interest for similar loans in the region when determining whether a plan provides for payment on a secured claim that is sufficient for purposes of § 1325(a)(5)(B), the court reasoned that "[t]he theory of the

statute is that the creditor is making a new loan to the debtor *in the amount of the current value of the collateral.*" 692 F.2d at 431 (emphasis added); *see also id.* at 429 ("In effect the law requires the creditor to make a new loan in the amount of the *value of the collateral* rather than repossess it....") (emphasis added).

Since § 1325(a)(5) calls for payment of the present value of a creditor's "allowed secured claim," the Sixth Circuit in effect equated that term with the value of the collateral. *See id.* ("The secured portion of the total claim represents the present value of the collateral and the unsecured portion is the remainder, i.e., the amount [by which] the allowed claim exceeds the value of the collateral."). And since the court did not adjust that figure for hypothetical sales costs, *Whitman* supports the conclusion that such an adjustment is inappropriate.[45]

For these reasons, I conclude that the hypothetical costs of selling the Debtors' home are not deductible when determining the extent of Foley's secured claim.

### SUMMARY

The claims of both Foley and NBD are subject to bifurcation under § 506(a) and avoidance, pursuant to § 506(d), of the underlying liens to the extent they are not supported by value. However, the Court will not invalidate either lien until entry of the Debtors' discharge pursuant to § 1328(a). The amount of Foley's allowed secured claim is not subject to adjustment based on the hypothetical cost of selling

**44.** For an example of just how hypothetical this inquiry can get, consider *In re Paige,* 13 B.R. 713, 715 (Bankr.S.D.Ohio 1981), in which the 10% cost-of-sale estimate was based in part on "possible points to be paid by the seller for nonconventional financing."

**45.** Other authorities have also implied that hypothetical sales costs are not relevant when valuing a lien pursuant to § 506(a). *See United States v. Ron Pair Enters., 489 U.S. 235, 239, 109 S.Ct. 1026, 1029, 103 L.Ed.2d 290 (1989) ("Subsection (a) of § 506 provides that a claim is secured only to the extent of the value of the property on which the lien is fixed...."); Timbers of Inwood Forest,* 484 U.S. at 372, 108 S.Ct.

at 631 ("The phrase 'value of such creditor's interest' in § 506(a) means 'the value of the collateral.' "); *United States v. Arnold,* 878 F.2d 925, 928 (6th Cir.1989) ("Section 1325(a)(5)(B), like section 1225(a)(5)(B), is sometimes referred to as a 'cramdown' provision because a secured creditor is forced to accept secured status under the plan only to the extent of the value of the collateral at the time.... Any indebtedness due the creditor in excess of the value of the collateral is included with other allowed unsecured claims."); Lundin, *supra* note 32, at § 5.39 ("If the bank's claim is $7,000 and the car [serving as collateral] is worth $5,000, then the bank's secured claim will be $5,000....").

the Debtors' home. An appropriate order shall enter.